T. Matthew Leckman (PA ID 92241)
LECKMAN LAW LLC
418 Newbold Road
Jenkintown, PA 19046
Tel: (215) 635-0584
matt@leckmanlaw.com

Ruth Rizkalla, Esq. (*pro hac vice* to be filed)
THE CARLSON LAW FIRM, PC
1230 Rosecrans Avenue, Suite 500
Manhattan Beach, CA 90266
Tel: (254) 526-5688
Fax: (254) 526-8204
rrizkalla@carlsonattorneys.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Jayda White and Tonia Lee, | Case No. |
| Plaintiffs, | **COMPLAINT FOR DAMAGES** |
| v. | |
| Microsoft Corporation, Epic Games, Inc., Roblox Corporation, and John Does I-XX<br>Defendants. | **DEMAND FOR JURY TRIAL** |

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

## COMPLAINT

PLAINTIFFS, Jayda White, and her Parent, Tonia Lee, hereby file their Complaint against the Defendants—MICROSOFT CORPORATION; EPIC GAMES, INC.; ROBLOX CORPORATION., and John Does I-XX—notifying each Defendant of Plaintiffs' claims for relief as available under Pennsylvania law. In support thereof, Plaintiffs allege and state:

### I.    NATURE OF THE ACTION

1.    Video game addiction, also called internet gaming disorder ("IGD"), is a condition characterized by severely reduced control over gaming habits and increasing priority given to gaming over other activities, resulting in negative consequences in many aspects of a person's life, including self-care, relationships, school, and work.

2.    Video game addiction has negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making. Those suffering stop interacting with friends and/or family, exhibit excessive rage, and no longer enjoy other hobbies or activities outside of their video games.

3.    Video game addiction causes rifts between minors and young adults with gaming-addiction and their loved ones—rifts beyond that normally experienced between children and their parents or other family members.

4.    Video game addiction and its harmful consequences are only expanding due to the advent of online gaming, cloud gaming, and streaming of games on any device at any time—giving minors unfettered access to "free" games that target those consumers to purchase products within the game to keep playing or for other game perks.

5.    Video game addiction is a world-wide epidemic harming our nation's youth and young adults.

6.    The rapid spread of video game addiction is a proximate result of Defendants' concerted effort to get consumers (*i.e.*, minor game players) addicted to

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

the Defendants' video game products to maximize Defendants' profits.

7. Defendants manufactured, published, marketed, and sold video games and gaming products, including those played by PLAINTIFF, which Defendants had specifically developed and designed to cause the addiction experienced by PLAINTIFF and other users.

8. Defendants use traditional game tactics such as feedback loops and reward systems, along with patented designs containing addictive features and technology to ensure its users keep playing longer and spending more on "microtransactions" within the game.

9. Defendants rely on microtransactions to increase their profits from individual games.

10. Defendants design their games to keep consumers playing—and spending—by enlisting the help of behavioral psychologists and neuroscientists to conduct state-of-the-art research and to collect data that Defendants use to develop and design their games to be as addictive as possible—especially to minors and young adults.

11. Defendants make their games addictive, in part, by encouraging long-term, extended game play despite knowledge that such extended play causes physical harm to the human brain – and particularly to a minor's developing brain.

12. Defendants' motive in developing, designing, manufacturing, publishing, and selling addictive video game products is their own bottom line.

13. By making their games addictive, Defendants can maximize profits after the original purchase or free download. Within their games, Defendants offer significant opportunity to purchase downloadable game products or in-game transactions, known as "microtransactions," to allegedly give players an advantage in the game, or to provide players with a "skin" for their character or weapon that has no impact on the game.

14. "Microtransactions" often occur because of Defendants' use of

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

"friends," targeted advertisements, or other deceptive tactics built into Defendants' video games. Thus, the more times a player comes back to play a game, the more times they are subjected to Defendants' deceptive and harmful conduct and more likely to spend more money within the game to keep playing, thereby increasing Defendants' bottom line.

15.    By keeping minors and young adults playing longer—and spending more money in the game in the process—Defendants are causing physical and mental harm to users while consistently increasing their revenue.

16.    By acquiring—and addicting—users when they are young, Defendants are securing their profit stream by ensuring future engagement and monetization as these young users age.

17.    Defendants are exploiting consumers, particularly minors and young adults, by using unfair, unconscionable, and deceptive trade practices and conduct that prioritizes gamer engagement and spending over gamer safety.

18.    Video game addiction impacts thousands of youths and their families across the country, including in Pennsylvania.

19.    Plaintiffs are one of those families who have been negatively impacted by the addiction and harm caused by each of Defendants' products.

20.    Defendants' intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts proximately caused PLAINTIFF's brain damage and gaming addiction, along with Plaintiffs' other damages as described herein.

21.    As a result of that gaming addiction and harm caused by Defendants' products, PLAINTIFF specifically experienced gaming addiction, brain damage, severe emotional distress, diminished social interactions, loss of friends, poor hygiene, and withdrawal symptoms such as rage, anger, and physical outbursts, hiding game play and stealing to purchase Robux.

22.    PLAINTIFF  has been diagnosed with depression, Attention Deficit Hyperactivity Disorder ("ADHD"), requiring outpatient mental health counseling,

and medication.

23. As a result of the gaming addiction and harm proximately caused by Defendants' misconduct, PLAINTIFF requires treatment, including outpatient mental health counseling, and medication and an individual education plan at school.

24. As a result of PLAINTIFF's gaming addiction and the harm proximately caused by Defendants' misconduct, PLAINTIFF's PARENT has personally witnessed and been affected by PLAINTIFF's gamer's rage and withdrawal symptoms. PLAINTIFF's PARENT has personally experienced emotional distress, pain, suffering, mental anguish, and loss of money as a proximate result of Defendants' misconduct.

25. Plaintiffs have been injured and harmed as a proximate result of Defendants' actions and misconduct; for that they are entitled to compensation and other damages under Pennsylvania law.

26. Defendants, individually and collectively, have willfully and knowingly engaged in fraudulent, deceptive, unfair, immoral, outrageous, wanton, and reckless behavior that damaged and continues to harm not only Plaintiffs, but countless other Pennsylvanians and citizens of the world. For this they should be punished, and punitive damages should be assessed against each Defendant for their respective misdeeds and unlawful conduct.

## II. PARTIES

27. PLAINTIFF is and at all times relevant to this action, was a citizen and resident of the Commonwealth of Pennsylvania whose principal place of residence being in Monroe County, Pennsylvania.

28. PLAINTIFF is 18 years old at the time of filing of this lawsuit.

29. PLAINTIFF began playing video games at 6 years old.

30. PLAINTIFF has continued to play video games at an increasing and uncontrollable pace since that time.

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

31.    PLAINTIFF specifically plays Roblox and Fortnite, and began playing at 12 years old.

32.    PLAINTIFF plays Roblox across multiple platforms—but specifically plays it on: an Apple iPhone and iPad.

33.    PLAINTIFF's PARENT is and at all times relevant to this action was, a citizen and resident of the Commonwealth of Pennsylvania whose principal place of residence is in Monroe County, Pennsylvania.

34.    PLAINTIFF's PARENT, Tonia Lee, also seek redress on their own behalf for loss of society and companionship, as well as for economic injuries and losses sustained as a result of PLAINTIFF's brain damage and gaming addiction proximately caused by each Defendant's intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, and for actual damages and injuries they personally sustained as a result of Defendants' deceptive, outrageous, fraudulent acts.

35.    **Game Manufacturer Defendants**

a. **Epic Games**

i.    Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business at 620 Crossroads Blvd, Cary, NC 27518.

ii.    Epic Games is authorized to do and does business in the Commonwealth of Pennsylvania and may be served with process upon its registered agent, 330 N Brand Blvd, Glendale, CA

iii.    At all times material hereto, Epic Games developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Fortnite series, either directly or indirectly, to members of the general public within the Commonwealth of

Pennsylvania, including to Plaintiffs.

b. **Roblox**

i. Defendant Roblox Corporation ("Roblox Corp.") is a Delaware corporation with its principal place of business at 910 Park Pl., San Mateo, CA 94403.

ii. Roblox Corp. is a video game developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold its video game, Roblox, either directly or indirectly, to members of the general public within the Commonwealth of Pennsylvania, including to Plaintiffs and may be served with process upon its registered agent, 2710 GATEWAY OAKS DRIVE, SACRAMENTO, CA.

36. **Microsoft Defendant**

a. **Microsoft**

i. Defendant Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business at 1 Microsoft Way, Redmond, WA, 98052. Microsoft is authorized to do and does business in the Commonwealth of Pennsylvania.

ii. At all times material hereto, Microsoft developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Xbox Series X console, either directly or indirectly, to members of the general public within the Commonwealth of Pennsylvania, including to Plaintiffs. At all times material hereto, Microsoft developed, tested, patented, assembled,

manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold subscriptions to Xbox Game Pass to members of the general public within the State of Illinois, including to Plaintiffs.

iii. Microsoft acted in concert with each other Defendant to distribute, market, supply, and/or sell the Fortnite and Roblox video games and all in-game downloadable content and in-game purchases contained therein in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

37.    Defendants John Does I–XX  are individuals, corporations, or entities as yet unidentified to Plaintiffs who were engaged in the research, development, manufacture, design, testing, sale, marketing, and promotion of gaming devices, software, hardware, products and transactions—and who introduced such products into interstate commerce or marketed such products with knowledge and intent that such products be sold in the Commonwealth of Pennsylvania—and who also may be liable for some or all of Plaintiffs' injuries and damages as described herein.  Despite reasonable and diligent inquiries by Plaintiffs, the identity of said tortfeasor(s) has not been determined as of this date, and it is necessary to conduct discovery in order to determine the identity of said tortfeasor(s).  If a John Doe Tortfeasor is identified for one or more causes of action, Plaintiffs will amend this Complaint accordingly.

38.    Upon information and belief, each Defendant was aware—or should have been aware—that game designers, developers, and publishers, including the other Defendants named herein, were engaging in the unlawful, deceptive, negligent, outrageous, immoral, and reckless behavior identified herein.

39.    Upon information and belief, Defendants acted in concert and entered into licensing agreements to utilize the same patents to keep users, including minor

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

players like PLAINTIFF., playing longer and dependent on (i.e., addicted) to Defendants' products.

40. At all times material hereto, each Defendant targeted consumers/purchasers, including minors like PLAINTIFF, to (1) purchase and/or play its video games and (2) to purchase in-game items or perks in exchange for real money, known as "microtransactions," through in-game advertising and "fake" avatar friends.

41. Each Defendant—with knowledge of PLAINTIFF's age and Pennsylvania residency—targeted PLAINTIFF and induced PLAINTIFF to enter into microtransactions.

42. Upon information and belief, each Defendant—with knowledge of PLAINTIFF's age and Pennsylvania residency, allowed third parties to target PLAINTIFF and induce PLAINTIFF into microtransactions within Defendants' products.

### III.   JURISDICTION AND VENUE

43. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of the *Complaint*.

44. This Complaint brings forth claims for relief arising under the laws of the Commonwealth of Pennsylvania, including but not limited to allegations that as a direct and proximate result of Defendants placing the defective gaming products into the stream of commerce, PLAINTIFF has suffered and continues to suffer both injuries and damages, as described herein, within the Commonwealth of Pennsylvania that exceed the sum or value of $75,000, exclusive of interest and costs.

45. This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states.

46. This Court has personal jurisdiction over each Defendant because each routinely conducts business in this State and has sufficient minimum contacts in this

State to have intentionally availed itself to this jurisdiction by marketing video game products and transacting business in this State.

47.     At all relevant times, each Defendant was present and transacted, solicited and conducted business in the Commonwealth of Pennsylvania through their employees, agents and/or sales representatives, and derived substantial revenue from such business.

48.     Defendants are conclusively presumed to have been doing business in this State and are subject to Pennsylvania's long arm jurisdiction.

49.     At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within Pennsylvania and throughout the United States.

50.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things: (a) Plaintiffs are all residents of this District and citizens of this State; (b) each Defendant directed its activities at residents in this District; (c) each Defendant conducted substantial business in this District; (d) each Defendant directed its activities and services at residents in this District; and (e) many of the acts and omissions that give rise to this action took place in this District.

## IV.    GENERAL ALLEGATIONS

### A. The Rise of Video Games

51.     A "game" is a closed, formal system that engages players in structured conflict and resolves its uncertainty in unequal outcome.

52.     Video games are closed in the fact that once engaged in the game, the player sets aside their rules for daily life and accepts the rules of the game as the status quo.

53.     A "video game" specifically is an object or device that stores recorded data or instructions generated by a person who uses it, and by processing the data or instructions creates an interactive game capable of being played, viewed, or experienced on or through a computer, gaming system, game console, or other

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

technology.

54.    Unlike traditional arcade-style games, online video games require active, lengthy participation, during which players are exposed to psychological techniques designed to control, manipulate and exploit minors' developing brains to increase game playing time and encourage in-game purchases.

55.    Such manipulation and exploitation are possible—and common—because video games have little regulation beyond the Entertainment Software Ratings Board.

56.    The first video games were sold in the 1970s, and by the mid-1980s, many video game franchises were released that are still in production today.

57.    The industry is yet young, and in a short period of time has rapidly evolved from gaming machines to games on virtual and augmented reality gaming consoles.

58.    Early video game companies would create games and sell them mostly through physical cartridges or discs and the costs of developing the game, and profits, were realized through the sale of their games over a period of time which resulted in a long and slow method of earning profits.

59.    A new revenue model based on in-game purchases was created that would allow the publishing companies to earn more profits over a very short period of time. This model is driven by increasing a minor's game play time and keeping them engaged to assure addiction and increase in-game purchases.

60.    Today's technology enables video games to be produced and operated on a unimaginable scale compared to 20 years ago. From open-world games with literally hundreds of square miles to explore, to role playing games that can take hundreds of hours to beat, there is a staggering amount of gameplay available to users in modern video games.

61.    The video gaming market grew slowly, taking more than 35 years to reach $35 billion; however, between 2007 and 2018, the industry has grown by more

than $100 billion to $137.9 billion.

62. The global video game industry occupies a special place in the entertainment and media market, now being one of the fastest-growing segments.

63. In 2023, the video game industry's revenue was $365.6 billion globally.

64. With the advent of in-game purchasing systems, video games as a consumer product have thrived from in-game purchases. Most of these purchases have been made by minors, including PLAINTIFF.

65. The explosive growth of the video game industry has been fueled by patented "monetization schemes" that target minors who are induced to make several in-game purchases, or "microtransactions," of downloadable products.

66. Often, there is no meaningful disclosure of the inclusion of microtransactions in the game at the time of download or the use of psychological mechanisms employed within the games for consumers or parents to make informed decisions about the appropriateness of games.

67. In order to entice minors to make such in-game purchases, video game developers and publishers, like Defendants, rely on minors and young adults becoming addicted to their video games so they play for more hours and spend more money on microtransactions.

### B. Microtransactions

68. Instances where players are able to spend real money for in-game items or perks are known as "microtransactions" (sometimes abbreviated "mtx").

69. The gaming industry calls such purchases "microtransactions" because a single virtual item is often relatively low in price, but often they are bundled together in "value" packs, or games require players to purchase them repeatedly in order to meaningfully advance the game or to acquire the most "valuable" items.

70. Some games allow players to purchase items that can be acquired through normal means; players may opt to make such purchases if they lack the skill or available time to earn the items through regular game play.

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

71.    Some games, however, heighten exclusivity by including items that can only be obtained through microtransactions.

72.    Microtransactions are often used in free-to-play games to provide a revenue source for the developers and publishers. Such free-to-play games that include a microtransaction model are sometimes referred to as a "freemium."

73.    While microtransactions are a staple of mobile app games, they are also seen on PC software and console gaming.

74.    Microtransactions first appeared in 2006 but did not prove to be a good profit-making model for developers and publishers until smartphones started to get more powerful and more players started switching to mobile gaming.

75.    In 2012, there was a huge rise of microtransactions mostly because of mobile gaming titles, and they became the normal model across the video gaming industry by 2014.

76.    Microtransactions are most commonly provided through a custom store interface placed inside the app or game for which the items are being sold.

77.    Developers and publishers can also use microtransactions to lock potentially significant product upgrades and "easter eggs" designed to extend gameplay and increase a player's dopamine levels behind paywalls.

78.    Unlike patches or updates, which are essential to remove bugs and enhance in-game experiences, microtransactions are non-essential components of the game and are planned in advance by companies.

79.    The market strategy for the game developers and publishers is that, in the long term, the revenue from a microtransaction system will outweigh the revenue from a one-time-purchase game.

80.    This is because microtransaction spending can easily—and quickly—add up to hundreds, or even thousands, of dollars.

81.    This new model heavily relies on patented algorithms built into the game, yet concealed from users, to ensure revenues earned by a video game are

recurring for as long as the game is available and players are playing it.

82.    Microtransactions were designed to use operant conditioning to ensure the impulsive behavior of players and the gaming environment and peer pressure to drive purchases.

83.    For instance, placing a time limitation on a microtransaction offer may push a user to impulsively buy a particular item. Similarly, a player's desire to be the first among a group of friends to buy an in-game premium item or achieve a higher-ranking will drive a player to make microtransaction purchases.

84.    Today, microtransactions make up 30% of the total gaming revenue earned across the industry.

85.    Microtransactions are not only benefiting the gaming industry publishers and developers; the console manufacturers and suppliers-owners of online video game stores that allow the microtransactions in video games made available to consumers take a cut of the revenue from each purchase—typically about 30% depending on the size of the app developer. For example, Google, Apple, and Steam all receive revenue for in-game purchases made on games downloaded through their products.

86.    While these corporate industries are benefiting from the microtransaction model, the most vulnerable to these manipulative monetization schemes are America's youth and young adults.

87.    Each Defendant knows this, or should be aware of this, because they have purposefully designed their video games to be addictive and rely on microtransactions to make money from this vulnerable population.

C. The Monetization Schemes Built into Video Games

88.    Predatory monetization schemes in video games are essentially purchasing systems within the games that disguise or withhold the long-term cost of an activity until players are already committed, both psychologically and financially.

89.    The schemes use psychological mechanisms, behavioral psychology, and

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

neuroscience to encourage repeated play and increased spending among users, especially among vulnerable populations like minors.

90. Specifically, such tactics may involve, either singularly or in combination: limited disclosure of the product, intrusive and unavoidable solicitations, and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.

91. Game developers and publishers utilize many strategies to enhance the predatory monetization tactics in their games. Such strategies include:

a. The "near miss": convincing players via exciting animation, for instance, that they were very close to winning;

b. "Chasing": encouraging players to keep playing to get back any money they just lost;

c. "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window;

d. "Exclusivity": suggesting that only a small number of a special prize are available so it must be obtained immediately;

e. "Entrapment": convincing players they are about to win, or they have invested enough to win, but if they stop playing, they will miss out on the win; or

f. The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

92. The psychological tactics described in the foregoing paragraph are only one part of the predatory monetization schemes.

93. Some games also permit a player limited or temporary possession of a certain item to encourage urgent use and/or additional purchasing. Others give only limited disclosure or misrepresentation of important conditions of the purchase, including the long-term value or utility of a purchased item.

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

94.    Another noteworthy aspect of predatory monetization is the collection and use of individual player data to manipulate the nature and presentation of purchasing offers in ways that maximize the likelihood of the player spending money. Specifically, the games are capable of tracking various player metrics and adjusting their design in automated ways to elicit in-game purchasing.

95.    Such schemes exploit an information asymmetry between purchaser and provider, in that the game system knows more about the player than the player can know about the game. This allows the gaming industry to use its knowledge of the player's game-related preferences, available funds, and/or playing and spending habits to present offers predetermined to maximize the likelihood of eliciting player spending.

96.    Games linked to a game player's social network pages also gather information about players and Defendants use this information to target products and microtransactions to users based on that player's unique interests and preferences.

97.    As the game system gathers more data on how various types of players behave under certain conditions, the game becomes better equipped to present in-game events and purchasing situations that will elicit the desired behavioral outcome (*i.e.,* spending or playing longer).

98.    The prices of in-game items may be determined by factors that are not disclosed to the player because the algorithm considers the player's available funds and cost sensitivity to certain items. This allows the game to incentivize continuous spending, while offering limited or no guarantees or protections.

99.    As the playing population as a collective invest more and more time in the game, the game system may become more adept at "knowing" each player, both individually and as part of its group.

100.    Such systems that dynamically adjust in-game item prices and value based on individual player analytics, which were primarily implemented by developers to serve monetary goals, and which lack basic transparency to the player,

may have the potential to exploit certain types of vulnerable players under certain conditions.

101.   These continued schemes with little to no restriction on the amount of spending in the payment interface also makes it easy for children to stop understanding the value of the actual money being spent and continue spending more and more.

102.   A few specific examples of predatory monetization schemes include Defendants' sale of loot boxes, pay-to-win models, and engagement optimized matchmaking.

### i. Loot Boxes

103.   A "loot box" is an in-game reward system that can be purchased repeatedly—with real money—to obtain a random selection of virtual items. Loot boxes could contain items that give players an advantage in the game, or cosmetic items that can be used to customize characters or weapons.

104.   Through purchasing a loot box, the player acquires a seemingly random assortment of items.

105.   The low probability of obtaining a desired item in a loot box means that the player will have to purchase an indeterminate number of loot boxes to obtain the item.

106.   Loot boxes require no player skill and have a randomly determined outcome (*i.e.,* prize).

107.   Loot boxes are essentially a lottery that provide a way for gaming developers, publishers, suppliers, and even console manufacturers to increase revenue through underage gambling.

108.   It is common knowledge that gambling addiction is a severe issue and a big risk when playing lottery-style games, so combining these aspects with the psychologically addictive traits of video games is highly dangerous for players.

109.   After being compared to gambling, many games started adding

probability to earn respective items in their loot boxes. However, the odds are still extremely against the players; rare items have incredibly low probabilities such as 0.08%.

110. Loot boxes still have the same designs, opening of animations, and more features to release dopamine leading to players purchasing more microtransactions— much like the tactics used in gambling.

111. Loot boxes are also ultimately controlled by the gaming developers and publishers, meaning that the "prizes" obtained from such boxes are likely to be determined by algorithms and other factors considered in the game design.

112. Loot boxes result in high revenues for the gaming developers and publishers, like Defendants, because instead of a one-time purchase for the desired item, users may have to buy multiple boxes.

### ii. Engagement Optimized Matchmaking

113. Another example of a monetization scheme is "engagement optimized matchmaking."

114. Games have long employed engagement optimized matchmaking to ensure dynamic difficulty, or a consistently challenging experience, irrespective of the player's skill level. For instance, matching computer opponents to a player's skill level.

115. Game developers and publishers also use this same principle of engagement optimized matchmaking with microtransactions to ensure that the game's financial requirements are adjusted to match the player's desire and capacity to pay.

116. In this sense, the "difficulty" of a monetized game may be considered analogous to the player's cost sensitivity or the willingness of the player to make continued in-game purchases.

117. If an item costs too much, then the players of monetized games cannot strategize to win, but instead must decide between making in-game purchases or not playing at all, or potentially playing without paying, but doing so with significantly

diminished in-game capability that generates regular feelings of frustration.

118.   Such technical sophistication in these purchasing systems aims to reduce the player's uncertainty or reluctance regarding purchasing decisions.

### iii. Pay-To-Win

119.   Some games operate on a "pay-to-win" model, a type of predatory monetization scheme that incentives players who pay more.

120.   Players who are willing to shell out more money get a disproportionate advantage over other players, particularly if the items cannot be obtained through free means.

121.   For example, paying players may get access to certain capabilities such as access to shortcuts, special characters with unique skills, or even special items. Such capabilities may make the games impossible to beat by ordinary, non-paying players.

122.   Games with such imbalances may prevent the non-paying players from progressing or remaining competitive.

### D. Patents Target Minors to Increase In-Game Spending

123.   Several video game developers and publishers have incorporated these design strategies into gaming patents that contribute to higher risk consumer behavior.

124.   Game companies often seek to keep their intellectual property confidential. As such, there are very few objective, transparent, or complete accounts on the precise nature of monetization in their games.

125.   Several patents shed light on the innovative video game monetization invented to nudge users into making in-game purchases, including:

     a.    U.S. Patent No. 8,360,866 B2, assigned to Leviathan Entertainment, LLC, describes an invention that encourages users to make in-game purchases when they face a difficult scenario, such as "kill[ing] a particular monster . . . or player character."

Such an offer is referred to by Luchene as an "upsell message" and "can be, for example, for an item that is useful in overcoming the difficulty the player has encountered."

b.    U.S. Patent No. 10,099,140 B2, assigned to Activision Publishing, Inc., similarly describes a "customized messaging campaign for [a game] player" and allows messages to be "customized for a gamer based on his or her behavioral data" such as "level of interest or satisfaction with a game." Triggers for such messages may include "a player winning or losing a predetermined number of games in a row" and may include "promotions relating to microtransactions or downloadable content."

c.    U.S. Patent No. 9,789,406 B2, assigned to Activision Publishing, Inc., modifies the difficulty of multiplayer matches to encourage microtransaction purchases. Specifically, the game identifies "an in-game item that may be relevant for (*i.e.*, of interest to) a first player," then locates "a second user that has acquired (*i.e.*, purchased), used, or otherwise possesses the in-game item." Matchmaking variables are then tuned such that the first player and second user are matched in a gameplay session.

d.    U.S. Patent No. 9,623,335 B1, assigned to Kabam, Inc., utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

e.    U.S. Patent No. 9,138,639 B1, assigned to Kabam, Inc., describes a system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a message for a

particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

f.   U.S. Patent No. 8,702,523 B2, assigned to Microsoft Corporation, was created to capitalize on a player's tendency to commit to a purchase after investing significant time into a trial version of a game. In short, a user is made "aware of an opportunity to add an achievement to their collection by downloading and playing a demo or trial version of a particular game," but "[i]nstead of recording the achievement" upon completion, the game "initiates a notification to the user . . . that the achievement will not be recorded unless they purchase the full version of the game at that time." More specifically, with the patent:

   i.   Game play achievements for a free trial version are tracked and maintained even if the console is not connected via a network to the server so that when, and if, the console is eventually connected to the server, the achievements saved locally (e.g., on the console hard drive, on an associated memory unit, etc.) are uploaded and become automatically discoverable to other online users playing the game on different consoles.

   ii.  The machine license, a component of the patent, allows any user on the console access to the downloaded game product, including all game components and product-content, regardless of the console's connection to the internet or the existence of parental controls.

g.   U.S. Patent No. 9,795,886 B1, assigned to Electronic Arts, Inc., allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's

power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

h.  U.S. Patent No. 10,252,170 B2, assigned to Hasbro, Inc., encourages players to make purchases outside of a game to receive in-game benefits and allows players can earn in-game points for scanning codes that come with separately purchased physical toys. For instance, the patent allows the developer using the patent in their video game design to stay connected with the user by requiring a player to keep their "avatar" charged by earning points by scanning codes on toys, through continued game play, or engaging in real world activities, thereby creating an endless video game running on a mobile electronic device that allows a player to play continuously as long as the player earns points playing the game, which is enhanced to allow the player to earn points by creating input from real environment activities, such as by scanning a code on a physical object or by producing activity related data from athletic activity.

i.  U.S. Patent No. 10,569,171 B2, assigned to Disney Enterprises, Inc., associates a gaming device with a "video game application that is associated with media content, such as a television show broadcast by a television network and displayed on a television." Such device "captures, e.g., from a microphone of the gaming device, an audio signal from the media content being played concurrently with the video game application" and "uses content recognition techniques to identify the media content, unlocks 'premium' in-game content that augment gameplay of the video game application."

j.      U.S. Patent No. 9,582,965 B1, assigned to Kabam, Inc., incentivizes users to alter virtual item balances in an online game. A game may specify "target balances of virtual items to be reached in user inventories" and may specify "a time by which such target balances must be reached." For instance, the player may be given a goal of reaching a target balance of 3,000 gems within 48 hours to receive a premium virtual item. The player has the option to use real-world money to buy gems to earn that goal. After the 48-hour time period passes, another goal may be set that specifies a target maximum balance of 1,000 gems, encouraging users to spend the newly acquired gems that were just purchased.

k.      U.S. Patent No. 9,403,093 B2, assigned to Kabam, Inc., encourages users to make purchases on multiple game platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating the play the game."

l.      U.S. Patent No. 9,626,475 B1, assigned to Kabam, Inc., facilitates a time-limited event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

m.      U.S. Patent No. 9,666,026 B1, assigned to Aftershock Services, Inc., provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in

relation to the virtual items. Offers provided "may include a first offer having a first value that progressively decreases based on an amount of users that have previously accepted the first offer in order to incentivize early acceptance of the offer."

n.    U.S. Patent No. 9,808,708 B1, assigned to Kabam, Inc., adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

o.    U.S. Patent App. No. 20160346677 A1, assigned to Electronic Arts, Inc., but currently abandoned, describes a system which provides "[a]pproaches to facilitating chance-based wait time reductions." Essentially, such a system would allow users to spend money to reduce waiting periods that may or may not be disclosed at the time of sale.

p.    International Application No. PCT/US2019/042697, a pending patent application filed by Sony Interactive Entertainment, LLC, would patent technology that suggests microtransactions to players who are stuck in the game to keep them engaging and playing the video game. More specifically, this patent would collect and "process[] game data of the player for determining a current state and process[] game data of other players that have completed the objective" in order to suggest to the player what "downloadable content (DLC), add-ons, upgrades, items, tips, strategy, communal data" or otherwise would be useful to the player to complete their objective. The patented method further includes operations for identifying successful attempts of completing the objective by other players and the resources used

in doing so, and send selects a resource that is usable by the player to complete the objective based on those resources by the other players in the successful attempts and presents the resource to the player for immediate use. *See also* US 202000030702A1, filed July 24, 2020.

126.   There was once a time when such lopsided consumer video game monetization-related inventions would have been patent ineligible. However, because of the introduction of these patents, game developers and publishers can further deceive and harm society's most vulnerable—minor children—while lining their own pockets.

127.   The mere fact that one video game publisher or developer holds a patent on certain monetized technology does not mean that similar schemes are not in other companies' games.

128.   It is common practice for developers and publishers, like Defendants, to utilize technology patented by other companies by entering into licensing agreements with the company holding the patent—or buy the rights to the patent outright.

**E. These Predatory Monetization Schemes Attract "Whales" to Defendants' Games**

129.   What players and parents, including Plaintiffs, often do not understand is that their gaming experience is not accidental, but rather carefully engineered by the game's manufacturers.

130.   In every game, there are several hundred, or maybe even thousands, of heavy playing users who spend much more money on the game than the other players.

131.   Companies employ tactics specifically to gain heavy playing users—or "whales" or "VIPs."—and to induce them into spending more money. For instance, when "whales" get stuck in the game, they are given a bonus to continue because it is better for the gaming companies to give them occasional free things than for the

players to get fed up and stop paying.

132. Gaming companies, like Defendants, have specialized departments within their companies to focus on these "whales" or "VIPs," to stay in contact with them, and to form relationships with them.

133. To target those who may be likely to spend additional money in the game, game developers and publishers, like Defendants, will monitor players and collect user information, from their game play to their social networks. Companies can then further target these users with advertisements or offers in an effort to increase their revenue at the expense of the player.

134. The gaming industry is built on those consumers who "maintain the game" and in turn create the revenue for the game companies. The proportion of heavy users significantly increases revenue numbers for these companies. By monetizing player addiction, game companies notably increase their bottom line.

**F. Defendants Include Specific Features in their Games to Keep Players Engaged – and Addicted**

135. In addition to microtransactions, video games include several additional features to keep players engaged and playing longer, including the use of algorithms, feedback loops, continuously adding new product content, and using tactics to ensure users are creating habits in their gameplay.

136. Many gaming features now are based on algorithms within the game to manipulate the type of play that users are experiencing.

137. For instance, Activision Blizzard, Inc. ("Activision") holds numerous patents that provide a framework of artificial intelligence to monitor, analyze, and control users' game time to increase game play time and fuel additional purchases.[1]

138. Upon information and belief, video game developers and publishers and video game product suppliers and manufacturers, including but not limited to

---

[1]    *See* Patents assigned to Activision publishing, JUSITIA, https://patents.justia.com/assignee/activision-publishing-inc (last accessed Oct. 29, 2023).

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

Defendants, license this patented technology from Activision, which allows the licensee, including all Defendants, to control users' experiences within the game.

139. Defendants are also utilizing several psychological tools to increase game play time, such as the use of feedback loops.

140. Feedback loops are systems where the game reacts to how well the player is doing in order to make the games more rewarding, or for tougher games, more challenging.

141. Feedback loops are a core part of video games because developers and publishers have a vested interest in making players want to play their games for as long as possible.

142. There are two kinds of feedback loops: positive and negative.

143. Positive feedback loops mean that when you're doing well, the game rewards you with things to help you do even better.

144. Negative feedback loops, on the other hand, add a challenge to a game when you are doing too well.

145. Feedback loops are used to bring balance to games that would otherwise get too difficult or too boring.

146. By introducing both positive and negative feedback loops into a game, designers can build a dynamic level of difficulty control.

147. A player's successes are reinforced through positive feedback loops, while their increasing ability to overcome the core game's challenges is curtailed by the use of negative feedback loops.

148. When done well, feedback loops enhance the player's experience by maintaining a consistent level of challenge throughout a game, while still rewarding the player for their achievements.

149. In theory, this creates the holy grail of the games design world, a game that maintains the feeling of challenge and achievement for the entirety of the game and keeps players playing longer.

150.    Gaming companies, like Defendants, also know that the best way to get a player to come back to the game and spend money is to make the game a habit or part of their life.

151.    Creating a habit consists of a cycle of three things: reminder, routine, and reward. The specific purpose of these rewards is to create a daily routine, and ultimately a habit, of playing the game for the user.

152.    Gaming companies, like Defendants, know this and use deceptive and unfair tactics to keep players coming back multiple times a day to play. For instance, gaming companies, like Defendants, try to addict players to their games by providing daily rewards or time-released rewards to keep players consistently coming back.

153.    Another tactic gaming companies, like Defendants, use to addict players is to add more game content over time thereby keeping users playing over a longer period of time.

154.    By constantly adding downloadable content or product upgrades to their video game products, *e.g.*, expansion packs and microtransactions, Defendants make it hard for players to finish a game while simultaneously keeping them hooked in the game.

G. **Dark Patterns and Drip Pricing Have Allowed Defendants to Further Exploit Users**

155.    For decades, unscrupulous direct mail marketers and brick-and-mortar retailers have relied on design tricks and psychological tactics, such as pre-checked boxes, hard-to-find-and-read disclosures, and confusing cancellation policies, to get consumers to part with their money or data.

156.    The term "dark patterns" was coined in 2010 by user design specialist Harry Brignull to describe the deceptive and manipulative design practices used to trick consumers into making choices that could or may cause them harm—and that they would or may not have otherwise made.

157.    The purpose behind "dark patterns' is to take advantage of consumers'

cognitive biases and steer their conduct or delay access to information needed to make fully informed decisions.

158. Research shows that "dark patterns" are highly effective at influencing consumer behavior.

159. The use of these manipulative design practices, or "dark patterns," has only grown in scale and sophistication as more and more commerce has moved online, thereby creating ever greater challenges for consumers.

160. Further challenging consumers is the common practice of using multiple "dark patterns" in combination, rather than in isolation.

161. "Dark patterns" tend to have even stronger effects when they are combined, so they are rarely used in isolation.

162. "Dark patterns" have a compounding effect, thereby increasing the impact of each and exacerbating the harm to the consumer.

163. The use of manipulative design techniques, including "dark patterns," in the digital world can pose heightened risks to consumers. For example, the pervasive nature of data collection techniques, allows companies to gather massive amounts of information about consumers' identities and online behavior, enabling businesses to adapt and leverage advertisements to target a particular demographic or even a particular consumer's interests.

164. Companies that market online can experiment with digital dark patterns more easily, frequently, and at a much larger scale than traditional brick-and-mortar retailers, to determine which design features most effectively influence consumer behavior. For example, online a company can easily and quickly rearrange products to mimic the consumers' behaviors, but also can easily test new marketing practices and digital dark patterns on consumers, deceiving consumers or manipulating them into taking unwitting or detrimental actions.

165. Some dark patterns manipulate consumer choice by inducing false beliefs- such as a minor's belief that a skin or other in-game purchase means the child

will actually obtain the desired object or game skill level.

166.   Other dark patterns operate by hiding or obscuring material information from consumers, such as burying key limitations of the product or service in dense Terms of Service documents that consumers do not see before purchase.

167.   Free-to-play or "freemium" games are an example of games that fail to disclose to a minor that a game they purchase is not the entire game.

168.   Another variation on the hidden-fee dark pattern is "drip pricing," in which companies advertise only part of a product's total price to lure in consumers, and do not mention other mandatory charges until late in the buying process.

169.   Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction.

170.   Microtransactions built into many video games by design are a form of drip-pricing.

171.   Each Defendant uses, or has used at relevant times, "dark patterns in the design, development, manufacture, advertising, marketing, promotion, supply, and sale of their respective gaming products.

**H. Cloud Gaming Enhances Defendants' Predatory Activities**

172.   Not only do individual games have predatory strategies built in to encourage users' spending and continued play, but several games are also now available on cloud-based systems.

173.   Cloud gaming, or gaming on demand, is a type of online gaming that runs video games on remote servers and streams them directly to a user's device.

174.   Traditionally, games would run locally on a user's video game console, personal computer, or mobile device.

175.   Cloud gaming products allow users to stream any game available on the product at any time.

176.   Cloud gaming eliminates the need for users to purchase expensive

computer hardware or install games directly onto a local game system.

177.   This means players have easy access to hundreds or even thousands of games at one time.

178.   What's more, the catalogue of games available online through video game streaming is ever-changing and evolving.

179.   The never-ending availability of a wide variety of games encourages users to stay engaged with the streaming product by ensuring they always have something new and different to play.

## I.   Defendants' Predatory Schemes Created a Generation of Gaming Addicts

180.   The feedback loops, other psychological properties, and cloud gaming products are designed to keep players continuously engaged, while the game patents are designed to study the skill level and behavior of the minor, even across social media platforms outside the game, so the game can bombard the minor with solicitations to purchase additional downloadable game content and/or loot boxes based upon psychological behavioral analyses that employ addiction methodology to seduce the minor to increase playing time and remain in the game. Essentially, the feedback loops, online video game products, and predatory monetization schemes work together to addict players to the games.

181.   During the last three decades, video games have become one of the major pastimes and one of the most growing industries worldwide. Today, 67% of all Americans play video games.[2]

182.   In 2008, the American National Purchase Diary ("NPD") group reported that 3% of the 174 million players using PC, MAC, or game consoles were extreme gamers who are playing an average of 45 hours a week. NPD reported that the percentage of extreme gamers had increased to 4% by 2010.[3]

---

[2] Hosseini et al., *Computer Gaming and Physiological Changes in the Brain: An Insight from QEEG Complexity Analysis*. 46(3) APPLIED PSYCHOPHYSIOLOGY AND Biofeedback 301 (2021).
[3] *Id.*

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

183.    Gaming addiction, also known as gaming disorder or internet gaming disorder, is characterized by severely reduced control over gaming habits, resulting in negative impacts on daily functioning, including personal, social, educational, and occupational responsibilities.

184.    IGD is a growing and prolonged behavioral pattern of gaming, leading to behavioral and cognitive syndromes. Those affected not only experienced increased loss of control over gaming, but also increased tolerance and the presence of withdrawal syndrome if they were unable to play at increasing periods of time.

185.    Gaming addicts are usually 12 to 20 years of age and spend a minimum of 8-10 hours playing video games. Preventing them from playing can lead to tension and anger and they may spend long stretches of time playing—without food or sleep.

186.    IGD can be diagnosed when an individual engages in gaming activities at the cost of fulfilling daily responsibilities or pursuing other interests without regard for the negative consequences.

187.    The main features of gaming disorder are impaired control over gaming, increasing priority given to gaming over other activities, and continuation or escalation of gaming despite negative consequences.

188.    The Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), the manual used by clinicians and researchers to diagnose and classify mental disorders, recognizes gaming disorder as a condition for further study that warrants more clinical research and experience.

189.    Gaming disorder is the only behavioral addiction recognized in the DSM-5.

190.    The DSM-5 acknowledges that several consequences from gaming disorder arise within only 5 to 12 weeks of beginning to play.

191.    Likewise, gaming disorder, with both online and offline variants, has been included in the International Classification of Diseases ("ICD-11"), the global categorization system for physical and mental illnesses published by the World

Health Organization.

192.    The American Psychiatric Association ("APA") suggests the effects or symptoms of IGD may be similar to those of other proposed psychological addictions.

193.    For instance, IGD may be an impulse control disorder like compulsive gambling.

194.    The APA has developed nine criteria for characterizing internet gaming disorder: (1) preoccupation with internet games; (2) withdrawal symptoms when internet gaming is taken away; (3) tolerance, resulting in the need to spend increasing amounts of time engaged in internet games; (4) unsuccessful attempts to control participation in internet games; (5) loss of interests in previous hobbies and entertainment as a result of, and with the exception of, internet games; (6) continued excessive use of internet games and despite knowledge of psychosocial problems; (7) deceiving family members, therapists, or others regarding the amount of internet gaming; (8) use of internet games to escape or relieve negative moods; and (9) jeopardizing or losing a significant relationship, job, or education or career opportunity because of participation in internet games.

195.    These nine criteria are also outlined in the DSM-5.

196.    Using these nine criteria, the IGD-20 Test was developed and was the first standardized psychometric tool to assess internet gaming disorder.

197.    The IGD-20 Test includes twenty (20) questions designed to assess the extent of problems caused by disordered gaming and the degree of symptoms experienced by gamers.

198.    The IGD-20 Test conceptualized disordered gaming according to the six first-order latent components well-established in behavioral addictions: salience, mood modification, tolerance, withdrawal symptoms, conflict, and relapse.

199.    The Internet Gaming Disorder Scale-Short-Form ("IGDS9-SF") was then created, as a brief standardized psychometric tool to assess gaming disorder.

200. The IGDS9-SF includes a total of nine items reflecting the nine clinical criteria identified by the APA.

201. Another commonly used instrument for the measurement of addiction is the Problem Video Game Playing ("PVP") Questionnaire, which is a scale measured by using a survey containing nine yes-or-no questions.

202. The PVP Questionnaire's survey questions are based on the DSM criteria for substance dependence and for pathological gambling, as well as the literature on addictions.

203. Approximately 3-4% of gamers are addicted to video games. In a 2021 systematic review and meta-analysis, the global prevalence of gaming disorder was found to be 3.05%, meaning as many as 60 million people (or more) are suffering from gaming disorder.

204. These statistics are even higher for minors: 8.5% of youths aged between 8 and 18 suffer from gaming disorder.

205. Comorbidity studies also indicate that individuals with ADHD may have an increased susceptibility to developing gaming disorder.

**J. Effects of Video Games on Adolescent Brains**

206. Research has shown prolonged gaming damages the prefrontal cortex, causing a loss of grey matter, lower cognitive function, and inability to regulate impulse control.

207. Researchers have concluded that excessive use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction.

208. Clinical evidence has shown that subjects addicted to online games experience biopsychological symptoms and complications. These symptoms may include the traditional symptoms of drug addiction, such as hangover, changes in mood, adaptability, withdrawal, conflict, and recurrence symptoms.

209. In 2008, the United States Federal Communications Commissioner said that online gaming addiction is one of the top reasons for college dropouts in the U.S.

210. Empirical studies indicate that internet gaming disorder is associated with detrimental health-related outcomes.

211. Brain imaging studies have shown that long-term video game playing affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

212. Other studies have shown excessive use of videogames leads to more negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

213. The prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 or 30.

214. The executive control center of the prefrontal cortex is essential for weighing risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals.

215. This may explain why young people are more likely to engage in hours of play while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes to draw on, minors and young adults are less able to weigh negative consequences and curb potentially harmful behavior like excessive video gaming, continuing to impact frontal lobe development.

216. Brain imaging studies have also shown structural changes in the brain, particularly a reduction in white-matter density, (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and gray-matter volume (associated with emotions, perception, memory, and motor control). Specifically, several regions of the brain showed reduction in gray-matter volume:



Regions that showed reduced gray-matter volume in IGD participants in more than two studies.[4]

217.    Brain activation studies have shown that videogame playing involved changes in reward and loss of control, and that gaming pictures activate regions similar to those activated by cue-exposure to drugs.

218.    Activation studies also show evidence that individuals with IGD have impaired inhibition, and that video game cues activate craving, attention, and executive function areas of the brain. These cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain as a result of prolonged exposure.



Regions that showed activation in response to internet and video game cues in IGD participants in more than two studies.[5]

219.    Structural studies have shown alterations in the volume of the ventral

_____

[4] Aviv Weinstein et al., *Neurobiological mechanisms underlying internet gaming disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).
[5] *Id.*

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

striatum (a critical component of motor and reward systems in the brain) are possible as a result of changes in reward.

220. One comparison study of young adults with a mean age of 24 also revealed that individuals who engage in excessive internet gaming tend to have lower cognitive function, especially in terms of verbal ability and working memory.

221. Research has shown that a minor with a diagnosis of ADHD, autism, or ODD is at a higher risk of video game addiction, worsening of ability to control impulsivity, and brain damage.

222. Research has shown that while video games may foster creativity in children, such benefits are outweighed by the negative aspects of addiction, which develop quickly in children and neurodivergent individuals exposed to video games for extended periods of time.

223. Video game play is associated with dopamine release similar in magnitude to that of drug abuse and gambling.

224. These increased dopamine releases in the brain can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is taken away or is unavailable to play.

225. As the APA has explained, gaming disorder specifically leads to the need to spend more time gaming, an inability to reduce time spent gaming, and unsuccessful attempts to quit gaming.

226. As concern over video game addiction grows, the use of psychopharmacology, psychotherapy, twelve-step programs, and use of continually developing treatment enhancements have been proposed to treat this disorder.

227. By designing and distributing these games with addictive technologies, Defendants ensured that they could increase and extend profits by addicting their most vulnerable users. They created, then exploited, an addiction among this country's most vulnerable, and Plaintiffs seek to hold them accountable.

## K. PLAINTIFF's Addiction, Injuries, and Damages

228.   PLAINTIFF is an 18-year-old addicted to video games; specifically, PLAINTIFF is addicted to playing Roblox and Fortnite.

229.   PLAINTIFF plays video games across multiple platforms, including an X-box, laptop and computer.

230.   Despite parental efforts to limit game time--efforts made astonishingly difficult, if not impossible, by the absence of parental controls within each Defendant's product, including but not limited to the absence of time-limit restrictions in Defendants' products, and Defendants' allowance of cross-sharing and cross-platform play using Defendants' products without providing parents' notice of this design defect or the ability to have control their child's use of the product--PLAINTIFF spends approximately six hours per day using Defendants' products to play video games.

231.   PLAINTIFF cannot refrain from gameplay and/or spending money while using Defendants' products.

232.   PLAINTIFF has spent approximately 6,000 hours, in total or collectively, using Defendants' products and playing video games.

233.   PLAINTIFF has spent large sums of money and/or used gift cards to purchase in-game transactions and downloadable products available in and accessible through Defendants' products. These funds do not include Plaintiffs' expenditures on Robux and/or Roblox Subscriptions.

234.   PLAINTIFF has had experienced the following as a result of the brain damage, gaming addiction and harm caused by Defendants' products: inability to limit game playing time, lack of interest in and loss of friends at school, social isolation, change in eating pattern, withdrawal symptoms (e.g., anger, cursing, physical outbursts, depression) when Defendants' products are taken away, and an inability to perform schoolwork independently at grade level, stealing to obtain money to play Roblox and Fortnite.

235.   PLAINTIFF'S PARENTs have lost hope in their ability to control PLAINTIFF's game playing time and worry about PLAINTIFF's mental and physical condition when attempting to take games away from PLAINTIFF.

236.   PLAINTIFF and PLAINTIFF's PARENT have experienced mental anguish, emotional distress, pain, suffering, and financial loss as a result of each Defendant's intentional, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, as described herein and are reasonably likely to continue to experience those injuries in the future due to the permanent impact of Defendants' wrongs on Plaintiffs.

237.   As a result of PLAINTIFF's gaming addiction and the harm proximately caused by each Defendant's intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, PLAINTIFF and PLAINTIFF's PARENT have experienced loss of society and companionship and have been financially damaged due to PLAINTIFF's addiction and uncontrollable in-game spending.

**L. Defendants' Conduct Specifically Led to Plaintiffs' Damages**

238.   Each Defendant is aware that its video games are harmful to minors and young adults because each Defendant specifically designed its products to addict and prey upon those users' developing brains.

239.   To this avail, each Defendant employs behavioral psychologists and/or neuroscientists to develop games that will best utilize psychological tactics to keep players engaged for longer periods of time.

240.   Due to the psychological aspects of the games, many of Defendants' products have been banned in other countries to avoid the harm to children that all Defendants are causing daily in the United States.

241.   No bans are in place here, and Defendants continue their pattern of addicting and harming our Nation's youth, young adults, and their families, including Plaintiffs.

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

### M. Defendants' Products Used by PLAINTIFF

**Roblox**

242.  Roblox is an online video game, developed and published by Roblox Corp., formally released for use by consumers in September of 2006.

243.  Roblox Corp.'s "mission" for Roblox is to have a billion people actively using and playing its game each day:



244.  Between its 2006 release and 2015, Roblox was only available for play on personal computers and mobile phones; however, with the release of Roblox for play on Microsoft's Xbox One gaming console in November of 2015 and the Oculus Rift virtual reality gaming headset in April 2016, the numbers of people (particularly minors) grew exponentially.

245.  Roblox Corp. also saw an accelerated increase in the numbers of consumers downloading and playing Roblox as a result of the Covid-19 pandemic.

246.  As of August of 2020, Roblox had over 164 million monthly active users, with more than half of those users being American children under age 16.

247.  The numbers of consumers, particularly minors, using and playing Roblox continued to grow in 2023, when Roblox Corp. released versions of its Roblox product for play on Sony's PlayStation 4 and the virtual reality gaming headsets, Meta Quest 2 and Meta Quest Pro.

---

[6] https://corp.roblox.com/

248.   Roblox Corp. markets Roblox as accessible on any device and, as of 2024, has released Roblox for use and play on personal computers, video gaming consoles, mobile phones, tablets, and virtual reality video gaming headsets:



249.   Currently, Roblox has over 66 million daily active users and over 217 million monthly active users, with more than 50% of consumers playing Roblox being under age 13.

250.   Roblox Corp. describes Roblox as an online, social gaming platform and game creation system that allows users to play games (or "experiences") built within Roblox and to program their own games (or "experiences") using Roblox Corp.'s proprietary engine, Roblox Studio.

251.   Roblox Corp. designed the game-creation aspect of its product to allow players to create their own Roblox video games, as well as purchasable, one-time "game passes" and "developer products" microtransactions, for play and purchase by other Roblox users, including minors.

252.   Roblox Corp. designed the social-gaming aspect of its product to allow players to play Roblox games (or experiences) created by other users, which includes allowing players to buy, sell, and create virtual items, accessories, and limited-availability products for use in gameplay.

253.   Roblox is free to play; however, Roblox is designed to encourage in-

---

[7] https://corp.roblox.com/

game purchases and product upgrade microtransactions, which can be purchased using Robux, the game's virtual currency.

254.   Robux can be obtained (a) purchased with real currency; (b) received a part of a recurring stipend given to users with a Roblox Premium membership; and (c) earned from selling "game passes" or developer products" to other Roblox players.[8]

255.   Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increases.

256.   For instance, corresponding with the increase of Roblox players due to the Covid-19 pandemic, Roblox Corp. earned $2.2 billion in revenue from Roblox in 2022—a 16% increase from 2021 earnings, which had been increased by 107% from its 2020, which had themselves been an 111% increase over 2019.

257.   Roblox Corp. specifically designed Roblox with certain addictive properties—at the risk of children's mental and physical health—to profit from product user's extended, long-term gameplay and corresponding in-game spending.

258.   Roblox Corp. hired psychologists and scientists to work with software engineers and game developers to ensure that their game includes the best psychological traits and technologies for player retention and addiction.

259.   Roblox Corp. used numerous addictive principles and technologies in Roblox's design. For example, in Roblox, players can create games and maps for other users to try and play, making it a challenge in and of its own. Through research and product development, Roblox Corp. learned that when playing games and completing challenges like this, a user's brain releases dopamine—the neurotransmitter in the brain that enables an individual to feel happiness and pleasure—and triggers the game player's brain to seek these dopamine hits on a more regular or compulsive basis leading to abuse, addictive behavior, and video game

---

[8] In the latter instance, should the user choose to exchange Robux acquired from purchases made by other Roblox players for real world currency, Roblox Corp. retains a percentage of the revenue.

addiction.

260.    Additionally, the variety within Roblox ensures that users are never bored and want to stop playing the game; there are always new challenges, maps, and characters to try, making the game feel like an ever-evolving entity that never stops providing entertainment.

261.    The ability for users to create their own games and challenges, combined with users' ability to spend real-world funds to change their avatar's image and abilities, makes sure that the gaming experience is different for players each time they log in.

262.    Such constant variety keeps players "hooked," or coming back daily and playing for hours.

263.    Roblox's "social gaming" design allows users to interact with friends or other users within the game—and creates a competitive environment whereby players are presented with microtransactions and in-game product purchases and pressured to spend money to keep up with their Roblox friends and competitors.

264.    Roblox Corp. makes in-game spending as easy as possible, and designed Roblox with addictive features to target minors and encourage them to engage in microtransactions in order to advance in the game, resulting in addicted and incompetent users quickly spend large sums of money inside the game without their parents, guardians, or other family members' knowledge or consent.

265.    Roblox Corp. does not adequately inform users of the inherent risks involved with using and playing Roblox or that the game was designed to addict and harm users

266.    Though it is equipped with the knowledge of the addictive risks inherent in its game, Roblox Corp. has failed to inform the public, users, or parents of such risks.

267.    Roblox Corp. describes its game as an educational tool for children: "Roblox provides a fun, supportive, and educational space where your child's

imagination can thrive."[9]

268.    Roblox Corp. even markets itself to educators, encouraging the use of Roblox in learning environments:



269.    While marketing its video game as an educational tool to benefit minors and neurodivergent individuals, Roblox Corp. does not disclose the psychology and addictive characteristics behind Roblox's design or that Roblox contains numerous addictive principles that are negatively impacting minors' and young adults' livelihoods, including their ability to learn and engage in critical thinking.

**N. Minors' Access to Defendants' Products**

270.    Defendants market their gaming products, including those played by PLAINTIFF on Defendants' devices and platforms, and their respective subscription services and in-game transactions, to minors.

271.    PLAINTIFF was such a minor to whom Defendants directed their marketing efforts and to whom Defendants sold their gaming products at all times relevant to this action.

272.    PLAINTIFF—as a minor—lacked the capacity to contract, and thus Plaintiffs expressly disaffirm any contract PLAINTIFF may have made with any of

---

[9] https://corporate.roblox.com/faq/
[10] https://education.roblox.com/

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

the Defendants, or that Defendants may claim PLAINTIFF made with them before reaching the age of majority.

273.   PLAINTIFF's continued use of Defendants' products is compulsive and due to addiction and in no way was an affirmation of any contract.

274.   After consumers purchase Defendants' gaming products, Defendants condition users' access to their gaming products on accepting terms and conditions and failure by users to accept and to continue to accept any new terms and conditions results in a loss of access to the purchased product. Each Defendant's terms of services or terms and conditions document is a contract of adhesion that has no variation or negotiable terms prior to signing between the parties. Accordingly, any terms to which Plaintiffs agreed prior to utilizing each Defendant's product, or while using such product, are void and unenforceable.

275.   Defendants' products were designed to addict PLAINTIFF to the products, which proximately caused PLAINTIFF's mental and physical health issues; therefore, Defendants' terms and conditions and any other purported contracts are void as against public policy as an individual cannot consent to harming a minor.

## V.    TOLLING OF STATUTE OF LIMITATIONS

276.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though fully set forth herein.

277.   PLAINTIFF was a minor at all times relevant to this action, having first started her usage of Defendants' games and platforms at the age of 12 and sustaining her injuries as a result of said usage before reaching the age of majority under Pennsylvania law (18 years of age).

278.   Under 42 Pa.C.S.A. § 5533 (b)(1)(i), "if an individual entitled to bring a civil action is an unemancipated minor at the time the cause of action accrues, the period of minority shall not be deemed a portion of the time period within which the action must be commenced. Such person shall have the same time for commencing an

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

action after attaining majority as is allowed to others by the provisions of this subchapter."

279.   PLAINTIFF reached the age of majority less than one year from the date this action is filed.

280.   Through the exercise of reasonable diligence, Plaintiffs could not have discovered that Defendants' products caused their injuries because, at the time of their injuries, the cause was unknown to Plaintiffs.

281.   Plaintiffs did not suspect and had no reason to suspect Defendants' products caused their injuries until within the last year.

282.   Due to the highly technical nature of the Defendants' products, Plaintiffs were unable to independently discover that Defendants' products caused their injuries until within the last year.

283.   Defendants had exclusive knowledge of the material defects designed and implemented into their products, and they have at all times through the present failed to disclose these designs.

284.   Defendants' fraudulent concealment has tolled the running of any statute of limitations.

285.   Defendants had a duty to disclose dangerous and defective features of their products that cause foreseeable harm to users—especially children and teens.

286.   Defendants knowingly, affirmatively, and actively concealed from Plaintiffs the risks associated with the defects of their products and that these products caused their injuries.

287.   Defendants' tortious and fraudulent acts continue to this day; as of the date of this Complaint, Defendants have not disclosed, and continue to conceal, that they designed and implemented dangerous features into their products.

288.   Despite their knowledge of the defects and their attendant safety risks, Defendants continue to market their products to children and teens—and even their

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

educators—while simultaneously omitting the disclosure of known and foreseeable harms.

289.  Plaintiffs were unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

290.  For the foregoing reasons, Defendants are estopped from relying on any statutes of limitations or repose as a defense in this action. All applicable statutes of limitation and repose have been tolled by, PLAINTIFF's legal status as minor at the time of accrual, operation of the discovery rule and by Defendants' active concealment with respect to all claims against Defendants.

## VI.    CAUSES OF ACTION

### COUNT I

### STRICT LIABILITY – DESIGN DEFECT

### (Against all Defendants)

291.  Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

292.  At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and otherwise distributing the video game products used by PLAINTIFF: Roblox and Fortnite.

293.  Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

294.  Each of the Defendant's respective products are marketed and advertised to minors and young adults.

295. Each Defendant defectively designed its respective products to addict minors and young adults who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harm from those products. More specifically:

    a.    Roblox Corp. designed Roblox with psychologically addictive properties and technologies, including but not limited to ever-changing gameplay, microtransactions, social aspects, and the use of algorithms to target players to purchase numerous characters, skins, and other in-game products;

    b.    Epic Games designed Fortnite to be as addictive as possible and includes numerous psychological tricks to ensnare users, including but not limited to a "near miss" effect, random rewards, bright and vibrate colors, and continual gameplay variety;

    c.    Microsoft designed the Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming with addictive features that include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users; it further designed it as a platform through which game manufacturers, including Defendants, could sell, market, and distribute addictive games to users, who, in turn, could download or access such games on their devices locally in a manner analogous to purchasing games on discs at a traditional store. Microsoft further designed its platform to push users to make purchases through the platform while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior,

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

296.   The defects in the design of each of the Defendant's respective products existed prior to the release of these products to PLAINTIFF and the public, and there was no substantial change to any of the products between the time of their manufacture (in regard to consoles or physical game copies) and the time of their distribution to PLAINTIFF via download or URL access (in regards to digital game copies and cloud gaming).

297.   PLAINTIFF used these products as intended and in a manner reasonably anticipated, and each Defendant knew or, by the exercise of reasonable care, should have known that PLAINTIFF would use these products without Plaintiffs inspecting them for their addictive nature.

298.   Each Defendant designed its respective products to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement, compulsive use, and additional mental and physical harm. More specifically:

    a.   Defendants designed the foregoing games, platforms, or "stores" in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

    b.   Defendants designed the foregoing games, platforms, or "stores" in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content;

299.   Each of the Defendant's respective products are defective in design and unreasonably dangerous when put to a reasonably anticipated use for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because

the products are less safe than an ordinary consumer would expect when used in such a manner.

300. Youth, including PLAINTIFF, and young adults are among the ordinary consumers of each of the Defendant's products.

301. Minors and young consumers, and their parents and guardians, do not expect: (a) Defendants' products to be psychologically and neurologically addictive when the products are used in its intended manner by its intended audience; (b) the patented design strategies and other features embedded by each Defendant in its respective products to make them initially and progressively more stimulative, to maximize young consumers' usage time and consequently addict them; or (c) each of the Defendant's revenues to be directly tied to this addictive mechanism and young consumer spending more time and money in downloadable in-game products and/or microtransactions.

302. Each of the Defendant's respective products are likewise defectively designed such that it creates an inherent risk of danger; specifically, a risk of brain damage, abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

303. Defendants' respective products were defective and unreasonably dangerous when they left the Defendants' respective possession and control. The defects continued to exist through the products' distribution to and use by consumers, including PLAINTIFF, who used the products without any substantial change in the products' condition.

304. The risks inherent in the design of each of the Defendant's respective products significantly outweigh any benefit of such design.

305. Each of the Defendants could have utilized cost-effective, reasonably feasible alternative designs including software design changes and changes to the

addictive features described above, to minimize the harms described herein, including, but not limited to:

a.      Choosing not to use "addictive" patents identified herein in the game design;

b.      Redesigning gaming software to limit rather than promote addictive engagement;

c.      Implementing robust age verification;

d.      Implementing effective parental controls;

e.      Implementing effective parental notifications;

f.      Warning of health effects of use and extended use upon sign-up or log-in;

g.      Implementing default protective limits to the length and frequency of gaming sessions;

h.      Implementing opt-in restrictions on the length and frequency of gaming sessions;

i.      Implementing self-limiting tools, including but not limited to game play time notifications, warnings, or reports;

j.      Implementing blocks to use during certain times of day (such as during school hours or late at night);

k.      Implementing limits on number of games playable per day;

l.      Implementing limits on the strategic timing and clustering of offers and/or assignments and challenges to keep players engaged and playing longer;

m.      Implementing limits on minors' in-game purchases, downloadable content, microtransactions, and total in-game spending per day;

n.      Designing products that did not include the defective features listed in this Complaint while still allowing users to engage with games without addictive engagement; and

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

o.     Others as set forth herein.

306.   Alternative designs were available that would reduce minors' addictive and compulsive engagement with each of the Defendant's respective products, and which would have effectively served the same purpose of Defendants' products while reducing the gravity and severity of danger posed by those products' defects.

307.   PLAINTIFF used Defendants' products as intended or in reasonably foreseeable ways.

308.   As a direct and proximate result of their use of Defendants' defectively designed products, PLAINTIFF sustained physical and mental injuries, emotional distress, pain and suffering, mental anguish, and economic injuries and damages.

309.   PLAINTIFF's injuries and damages were reasonably foreseeable to each of the Defendants at the time of their respective products' development, design, advertising, marketing, promotion, and distribution, especially considering each of the Defendant's conduct—described herein—of specifically designing their respect products to be addictive.

310.   The defective design of the products used by PLAINTIFF was a substantial factor in causing harm to PLAINTIFF

311.   As a direct and proximate result of Defendants' respective products' defective design, PLAINTIFF sustained brain damage, became addicted to video games, loss of cognitive function and ability to regulate impulsivity, decline in ability to learn and be educated, mental harm, emotional distress, pain and suffering, and mental anguish.

312.   PLAINTIFF was injured as a direct and proximate result of each of the Defendant's respective defective designs, as described herein, and Plaintiffs suffered economic damages as a result thereof.

313.   The defective design of Defendants' respective products, as identified and described herein, is a proximate cause of the harm and injuries to PLAINTIFF

314.  Plaintiffs' damages proximately caused by Defendants' defective design are all those a jury believes will fairly and justly compensate Plaintiffs for any damages Plaintiffs sustained, including but not limited to PLAINTIFF's physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; PLAINTIFF's inability to attend school; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to PLAINTIFF's physical and mental injuries. PLAINTIFF's injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

315.  Defendants are strictly liable due to the defective design of their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

316.  The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

317.  The nature of the intentional and fraudulent acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, PLAINTIFF continues to use Defendants' respective products. While PLAINTIFF uses Defendants' respective products, Plaintiffs will not be able to independently verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

318.  The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous.  Each Defendant acted with deliberate and flagrant disregard, an entire want of care, and a depraved indifference to the consequences of its conduct,

- 53 -

including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT II

## STRICT LIABILITY – FAILURE TO WARN

### (Against All Defendants)

319.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

320.   At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by PLAINTIFF: Roblox and Fortnite.

321.   Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

322.   Each of the Defendant's respective products are also marketed and advertised to minors, young adults, and neurodivergent individuals.

323.   None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

324.   None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that their products pose a higher risk of addiction, worsening of an ability to control impulsivity, and brain damage in neurodivergent individuals, including individuals with a diagnosis of ADHD, autism, or ODD.

325.    Each of the Defendants sold and distributed its respective products to PLAINTIFF in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to youth as described herein, including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

326.    Each of the Defendants sold and distributed its respective products to PLAINTIFF in a defective and unreasonably dangerous condition by failing to provide reasonable and adequate instructions with respect to the conditions and methods of the product's safe use when a risk of abuse, addiction, and compulsive use by youth was reasonably foreseeable in its use, unless the danger is known to the user or is reasonably discoverable by them.

327.    Each of the Defendant's respective products are dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they cause brain damage and encourage unhealthy, addictive engagement, and compulsive use.

328.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth considering its own internal information and knowledge regarding its products at the time of development, design, marketing, promotion, advertising, and distribution.

329.    Defendants' respective products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things:

　　　　a.    Defendants' respective products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries;

b.     Defendants' respective products harvest and utilize user data in such a way that increases a user's risk of addiction to these products and simultaneous physical and mental injuries;

c.     The feedback loops and strategized patented material in Defendants' respective products are designed to promote increasingly stimulative and alarming gameplay to encourage compulsive engagement by the user, raising the risk of mental health harms, including but not limited to addiction;

d.     New users of Defendants' respective products can identify themselves as minors, begin to use the product, and do so indefinitely, without any time or usage limitations, without any spending limitations, without ever receiving a safety warning, and without ever having to provide information so that each Defendant can warn the users' parents or guardians;

e.     The likelihood and severity of harms is greater for minors and young adults, especially those who are neurodivergent; and

f.     The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another and by patented technology and code design, some of which is currently publicly unknown and hidden from users.

330.   Ordinary users would not have recognized the potential risks of Defendants' respective products when used in a manner reasonably foreseeable to each of the Defendants.

331.   Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using Defendants' respective products, Plaintiffs would have heeded the warnings and/or instructions.

332.   A reasonable company under the same or similar circumstances as each of the Defendants would have used provided adequate warnings and/or instructions to

consumers, including minor users and parents like Plaintiffs.

333. At all relevant times, each Defendant could have provided adequate warnings and/or instructions to prevent the harm and injuries described herein.

334. Had Plaintiffs received proper or adequate warnings and/or instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, Plaintiffs would have followed such instructions.

335. Each Defendant's failure to adequately warn and/or instruct Plaintiffs about the risks of its defective products was a proximate cause and a substantial factor in the injuries sustained by Plaintiffs.

336. As a direct and proximate result of each Defendant's failure to warn and/or instruct PLAINTIFF has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses, as described herein.

337. Defendants are strictly liable due to each Defendant's failure to warn of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

338. Plaintiffs' injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

339. The nature of the fraudulent and unlawful acts that created safety concerns for PLAINTIFF are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, PLAINTIFF continues to use Defendants' respective products. When PLAINTIFF uses Defendants' respective products, Plaintiffs will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

340.   The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous. Each Defendant acted with flagrant disregard, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including PLAINTIFF, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

**COUNT III**

**NEGLIGENCE – DESIGN**

**(Against All Defendants)**

341.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

342.   At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by PLAINTIFF: Roblox and Fortnite.

343.   Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

344.   Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

345.   Each Defendant knew or, by the exercise of reasonable care, should have known, that its respective products were dangerous, harmful, and injurious when used by youth in a reasonably foreseeable manner. More specifically:

      a.    The Game Manufacturing Defendants designed Roblox and Fortnite with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or

           neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    b. Microsoft designed the Xbox as a platform through which game manufacturers, including Defendants, could sell, market, and distribute addictive games to users, who, in turn, could download or access such games on their devices locally in a manner analogous to purchasing games on discs at a traditional store. The Platform Manufacturing Defendants designed its platform to push users to make purchases through the platform while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

346. Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to PLAINTIFF.

347. Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Defendants' respective products. Those risks include brain damage, abuse, addiction, and compulsive use in youth which can lead to a cascade of negative effects including but not limited to dissociative

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

348. Each Defendant knew that minors like PLAINTIFF would use its respective products.

349. Despite this knowledge, each Defendant failed to warn users, including Plaintiffs, of their respective product's dangerous propensity.

350. PLAINTIFF was a foreseeable user of the Defendants' respective products.

351. Each Defendant had a non-delegable duty to use ordinary care in its design and to package the product in order to protect those who will use it and who are in the area of its use from unreasonable risk of harm while it is being used for its intended purpose or while it is being used for any purpose which should reasonably be expected by the manufacturer.

352. Each Defendant owed this duty to design, publish, supply, and sell reasonably safe products to users, including PLAINTIFF.

353. Each Defendant breached this duty. These breaches include, but are not limited to:

a. Utilizing patented designs and technology for purposes of addicting users to the Defendant's respective products;

b. Failing to use ordinary care in the design of its products by negligently designing them with features and patented technology as described above that specifically are addictive and harmful to youth, who are particularly unable to appreciate the risks posed by the products;

c. Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

d.   Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

e.   Failing to use ordinary care in the design of its products by negligently designing its products with features and patented technology as described above that created or increased the risk of brain damage, abuse and addiction in youth, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.   Failing to use ordinary care to use cost-effective, reasonably feasible alternative designs, including changes to feedback loops and the addictive features described above, and other safety measures, to minimize the harms described herein; and

g.   Otherwise failing to use ordinary care in the design of the products.

354.   Alternative designs that would reduce the addictive features of Defendants' respective products were available, would have effectively served the same purpose as each of the Defendant's defectively designed products, and would have reduced the gravity and severity of danger Defendants' respective products posed minors such as PLAINTIFF

355.   A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

356.   At all relevant times, PLAINTIFF used Defendants' respective products in the manner in which they were intended by Defendants to be used.

357.   As a direct and proximate result of each of the Defendant's breached duties, Plaintiffs were harmed.

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

358. Defendants' design of their respective products was a substantial factor in causing the Plaintiffs' harm and injuries, as described herein.

359. As a direct and proximate result of each of the Defendant's breached duties, PLAINTIFF has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

360. As a direct and proximate result of each of the Defendant's breached duties, Plaintiffs have suffered—and continue to suffer—economic loss and damages, as described herein.

361. Defendants negligently designed their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

## COUNT IV

## NEGLIGENCE – FAILURE TO WARN

### (Against All Defendants)

362. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

363. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by PLAINTIFF: Roblox and Fortnite.

364. Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

365. Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

366. Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth. More specifically:

   a. Roblox Corp and Epic Games designed Roblox and Fortnite, respectively, with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

   b. MICROSOFT designed Xbox as a platform as a platform through which game manufacturers, including Defendants, could sell, market, and distribute addictive games to users, who, in turn, could download or access such games on their devices locally in a manner analogous to purchasing games on discs at a traditional store. The Platform Manufacturing Defendants designed its platform to push users to make purchases through the platform while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

367. Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information

and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to PLAINTIFF

368. Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as PLAINTIFF would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

369. Each Defendant knew that minors, including PLAINTIFF, would use its respective products.

370. None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

371. None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that their products pose a higher risk of addiction, worsening of an ability to control impulsivity, and brain damage in neurodivergent individuals, including individuals with a diagnosis of ADHD, autism, or ODD.

372. Had Plaintiffs received proper or adequate warnings about the risks of Defendants' respective products, Plaintiffs would have heeded such warnings.

373. Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product for a purpose and in a manner which the manufacturer should reasonably foresee.

374. Each Defendant had a duty to give reasonable and adequate instructions with respect to the conditions and methods of its safe use when danger is reasonably

foreseeable in its use, as the risks and dangers are unknown and not reasonably discoverable by users.

375.   Each Defendant owed these duties to users including PLAINTIFF

376.   Each Defendant breached this duty owed to PLAINTIFF, a foreseeable user. These breaches include, but are not limited to:

a.   Failing to warn users that Defendants' respective products cause brain damage, addiction, compulsive use, and/or other simultaneous physical and mental injuries; and

b.   Failing to otherwise provide reasonable and adequate warnings to Plaintiffs, as set forth above, about the dangers inherent or reasonably foreseeable posed by the use of each Defendant's product.

c.   Failing to give any instructions with respect to the addictive conditions of their respective products or on methods of safe use to avoid the risks and harm built into each Defendants' respective gaming products.

377.   A reasonable company under the same or similar circumstances as Defendants would have used reasonable care to provide adequate warnings and/or instructions to consumers, including the parents of minor users, as described herein.

378.   At all relevant times, each Defendant could have provided adequate warnings and/or instructions to prevent the harm and injuries described herein.

379.   Had Plaintiffs received proper or adequate warnings and/or instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, Plaintiffs would have heeded such warnings.

380.   As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate warnings and/or instructions, Plaintiffs were harmed and sustained the injuries set forth herein. Each Defendant's failure to

provide adequate and sufficient warnings was a substantial factor in causing harm to Plaintiffs.

381. Each Defendant negligently failed to warn and/or instruct consumers, including Plaintiffs, of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

## COUNT V

## NEGLIGENCE PER SE

### (Against All Defendants)

382. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

383. The United States Congress has enacted the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq.*, to protect minors who use the Internet.

384. Federal regulations, specifically 16 C.F.R. § 312 *et seq.*, have been put in place to effectuate COPPA's purposes and which establish certain obligations for operators of websites and online services that are intended to inform parents and guardians about the collection of their children's personal information.

385. COPPA requires operators of online services and websites directed to children under 13 to notify parents about the personal information they collect and to obtain verifiable parental consent before collecting and using any personal information collected from children. 16 C.F.R. § 312.4(a).

386. The parental notice required by COPPA "must be clearly and understandably written, complete, and must contain no unrelated, confusing, or contradictory materials." 16 C.F.R. § 312.4(a).

387. COPPA requires operators to make reasonable efforts to ensure that a parent of a child receives direct notice of the operator's practices with regard to the

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

collection, use, or disclosure of personal information from children before collecting personal information from children. 16 C.F.R. § 312.4(b).

388. COPPA requires operators of online services and websites to collect a child's telephone number, as opposed to online contact information, without first obtaining verifiable parental consent. 16 C.F.R. § 312.5(c)(1) and (6).

389. COPPA requires operators to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that each Defendant collects personal information from children. 16 C.F.R. § 312.4(d).

390. A violation of COPPA, including the regulations enacted to enforce that law, constitutes an unfair or deceptive act or practice in or affecting commerce. *See* 15 U.S.C. § 6502(c); 15 U.S.C. § 45(a)(1).

391. Avatars generated from a child's image, and biometric and health information, are covered by COPPA when collected with other personal data.

392. Each Defendant is an "operator" as defined by 16 C.F.R. § 312.2 and, therefore, subject to the laws and regulations established by COPPA.

393. Each of the Defendants collects or uses personal information from children under the age of 13—including PLAINTIFF—through its respective products that are directed to (or that each Defendant has actual knowledge were used by) children.

394. Each Defendant has actual knowledge that it collects personal information directly from users of its respective websites or online services.

395. Each Defendant has collected or used personal information from children younger than age 13 in violation of COPPA by, at least:

    a. Failing to provide through their respective websites and apps a clear, understandable, and complete direct notice to parents that described each Defendant's respective practices regarding the collection, use, or disclosure of children's personal information, in violation of 16 C.F.R. § 312.4(a) and (c);

b.      Failing to make reasonable efforts, taking into account available technology, to ensure parents received such notice on their websites and applications so that parents could provide informed consent, in violation of 16 C.F.R. § 312.4(b)-(c); and

c.      Failing to obtain verifiable parental consent before any collection, use, or disclosure of personal information from children, in violation of 16 C.F.R. § 312.5(a)(1).

396.    **Roblox Corp., in connection with its Roblox online game platform and game creation system, violated COPPA and those violations include, but are not limited to:**

a.      Using a "voice chat" feature that requires users, including minors, to submit uniquely identifying scans of their face to utilize the feature under the guise of "age verification" when Roblox Corp. is using sophisticated artificial intelligence to create faceprints—as uniquely identifying as a fingerprint—to track the user and their gaming patterns;

b.      Allowing advertising to be surreptitiously interlaced with organic content in a multitude of ways, while knowing millions of young children are exposed to that advertising daily;

c.      Failing to adequately disclose to children when advertising is present withing experiences and videos on Roblox; and

d.      Failing to ensure that social media influencers clearly and conspicuously disclose their material connections to Roblox in a manner that is understandable to children.

397.    Defendants have violated statutory and regulatory law, as identified above, and with each statutory violation, each Defendant proximately caused injury and damage to Plaintiffs. This damage includes the injuries and harms to Plaintiffs

described above, including but not limited to PLAINTIFF's addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life. Further, as a direct and proximate result of each of the Defendant's statutory violations, PLAINTIFF has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

398. Plaintiffs are within the class of persons that these statutes and regulations are intended to protect—and Plaintiffs' injuries and damages are the type of harm that these statutes and regulations are intended to prevent—therefore, each Defendant is *per se* negligent for violating the COPPA.

**COUNT VI**

**NEGLIGENCE - ORDINARY**

**(Against All Defendants)**

399. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

400. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by PLAINTIFF: Roblox and Fortnite

401. Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

402. Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

403.   Each Defendant owed PLAINTIFF a duty to act as a reasonably careful company would under the circumstances.

404.   Each Defendant has breached the duties owed to PLAINTIFF

405.   A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

406.   A reasonably careful company would protect PLAINTIFF from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

407.   A reasonably careful company would not invite, encourage, or facilitate youth, such as PLAINTIFF, to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

408.   A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant did just that. More specifically:

a.   Roblox Corp and Epic Games, failed to disclose that they designed Roblox and Fortnite, respectively, with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b.   MICROSOFT failed to disclose that it designed the Xbox as a platform through which game manufacturers, including

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

Defendants, could sell, market, and distribute addictive games to users, who, in turn, could download or access such games on their devices locally in a manner analogous to purchasing games on discs at a traditional store. The Platform Manufacturing Defendants designed its platform to push users to make purchases through the platform while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

409. PLAINTIFF was a foreseeable user of the Defendants' respective products.

410. Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of PLAINTIFF's use of Defendants' respective products.

411. Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its respective products (as developed, set up, managed, maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious when used by youth such as PLAINTIFF in a reasonably foreseeable manner. More specifically, each Defendant should have known this because each designed their respective gaming products with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, physical damage to the brain, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

412. At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

unreasonable risks of harm to youth such as PLAINTIFF, which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

413.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its respective products, such as PLAINTIFF, would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

414.    Each Defendant's conduct was closely connected to PLAINTIFF's injuries and Plaintiffs' damages, which were highly certain to occur.

415.    Each Defendant could have avoided Plaintiffs' injuries with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its respective products which harmed PLAINTIFF

416.    Each Defendant is also required to comply with the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq.*, and the corresponding federal regulations, 16 C.F.R. § 312 *et seq.*

417.    COPPA protects minors who use the internet and requires each Defendant to utilize a heightened duty of care for users under the age of 13 due to the recognized safety risks pose to such users from interactive online products like Defendants' respective gaming products. *See, e.g.,* 16 C.F.R. §§ 312.4, 312.5.

418.    Each of the Defendants collects or uses personal information from children under the age of 13—including PLAINTIFF—through its respective products that are directed to (or that each Defendant has actual knowledge were used by) children.

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

419. Each Defendant has actual knowledge that it collects personal information, including but not limited to avatars generated from a child's image, biometric and health information, and geolocations, directly from users of its respective websites or online services.

420. Each Defendant utilizes data collected users' personal information to design and develop new products and microtransactions, and also uses the collected personal information with algorithms and other patented technologies to target product users.

421. As described above, each Defendant has collected or used personal information from children younger than age 13 in violation of COPPA by, at least:

a. Failing to provide through their respective websites and apps a clear, understandable, and complete direct notice to parents or guardians that described each Defendant's respective practices regarding the collection, use, or disclosure of children's personal information, in violation of 16 C.F.R. § 312.4(a) and (c);

b. Failing to make reasonable efforts, and/or take into account available technology, to ensure parents or guardians received such notice on their websites and applications so that parents or guardians could provide informed consent, in violation of 16 C.F.R. § 312.4(b)-(c); and

c. Failing to obtain verifiable parental or guardian consent before any collection, use, or disclosure of personal information from children, in violation of 16 C.F.R. § 312.5(a)(1).

422. Roblox Corp and Epic Games**, in connection with** their games, Roblox and Fortnite, respectively, their respective **online game platform**s **and game creation system**s**, violated COPPA and those violations include, but are not limited to:**

a.      Using a "voice chat" feature that requires users, including minors, to submit uniquely identifying scans of their face to utilize the feature under the guise of "age verification" when Roblox Corp. is using sophisticated artificial intelligence to create faceprints—as uniquely identifying as a fingerprint—to track the user and their gaming patterns;

b.      Allowing advertising to be surreptitiously interlaced with organic content in a multitude of ways, while knowing millions of young children are exposed to that advertising daily;

c.      Failing to adequately disclose to children when advertising is present withing experiences and videos on Roblox; and

d.      Failing to ensure that social media influencers clearly and conspicuously disclose their material connections to Roblox in a manner that is understandable to children.

423.    MICROSOFT designed the Xbox as a platform through which game manufacturers, including Defendants, could sell, market, and distribute addictive games to users, who, in turn, could download or access such games on their devices locally in a manner analogous to purchasing games on discs at a traditional store. The Platform Manufacturing Defendants designed its platform to push users to make purchases through the platform while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

424.    Each Defendants' COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minor into buying microtransactions or unknowingly make in-game purchases using the game patens and other illegal dark patterns.

425.   Each Defendant also owes a duty to not to engage in any unlawful practice including any act, use or employment of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce.  *See* Mo. Rev. Stat. § 407.020.

426.   Each Defendant engaged in unlawful acts and practices as described in Mo. Rev. Stat. § 407.020.1 in connection with the design, development, publishing, marketing, and sale of their respective gaming products, as identified and described herein.

427.   Each of the Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the risk of using Defendants' respective products that were known to each of the Defendants, or that each of the Defendants should have known through the exercise of reasonable care, and how to alter regular gameplay in order to avoid such risks.

428.   Each Defendant has breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

    a.    Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including PLAINTIFF;

    b.    Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including PLAINTIFF, including but not limited to dissociative behavior, withdrawal symptoms, social

isolation, negative consequences on cognitive processes, and other harmful effects;

c.    Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including PLAINTIFF;

d.    Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including PLAINTIFF;

e.    Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including PLAINTIFF, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.    Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including PLAINTIFF;

g.    Developing, patenting, and licensing unreasonably dangerous features and algorithms for video game products after notice that such features and algorithms, as structured and operated, posed a

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

foreseeable risk of harm to the physical and mental health and well-being of youth users, like PLAINTIFF;

h.      Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users; and

i.      Facilitating use of their respective products by youth under the age of 13, including by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols.

429.    Each Defendant has breached its duties of care owed to Plaintiffs through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a.      Failing to implement effective protocols to block users under the age of 13;

b.      Failing to implement effective parental controls;

c.      Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

d.      Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content, product upgrades, and/or microtransactions;

e.      Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

f.      Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

430.    Each Defendant further breached the duty owed to recognize the safety risks posed to such users from interactive online products, such as Defendants' respective products, pursuant to 15 U.S.C. § 6501 *et seq.*

431.    Each Defendant also breached its duty owed under Mo. Rev. Stat. § 407.020 *et seq.* not to engage in unlawful or deceptive business acts or practices.

432.    A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users like PLAINTIFF; yet Defendants did not do this. This was a breach of duties owed to Plaintiffs.

433.    As a direct and proximate result of each Defendant's breach of one or more of its duties, PLAINTIFF has been injured and Plaintiffs were harmed. Such injuries and harms include addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

434.    Each Defendant's breach of one or more of its duties is a proximate cause of PLAINTIFF's injuries and the damages sustained by Plaintiffs.

435. As a direct and proximate result of each of the Defendant's breach of duties, PLAINTIFF has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

436. Each Defendant was negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

437. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

438. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by PLAINTIFF: Roblox and Fortnite on PLATFORM.

439. As described herein, each of the Defendants intentionally designed its respective products to addict minors and young adults who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products:

    a.    Roblox Corp and Epic Games designed Roblox and Fortnite, respectively, with psychologically addictive properties and technologies, including but not limited to ever-changing gameplay, microtransactions, social aspects, and the use of algorithms to target players to purchase numerous characters, skins, and other in-game products;

    b.    MICROSOFT designed the Xbox as a platform through which game manufacturers, including Defendants, could sell, market,

and distribute addictive games to users, who, in turn, could download or access such games on their devices locally in a manner analogous to purchasing games on discs at a traditional store. The Platform Manufacturing Defendants designed its platform to push users to make purchases through the platform while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

440.   Each Defendant intentionally designed its respective products to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

a.     Roblox Corp. designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

b.     Apple designed the Apple App Store in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content;

441.   Defendants intended for their products to be psychologically and neurologically addictive when used in their intended manner by their intended audience; and intended for minors, like PLAINTIFF, to use each Defendants' respective product and intended for users, like PLAINTIFF, to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of Defendants' conduct and immoral tactics.

442.   Each Defendant knew that extended use of video games, *i.e.,* their products, could cause addiction.

443. Each Defendant intentionally did not warn users, prospective users, or their parents/guardians of the addictive components of their games and gaming products.

444. Each Defendant's conduct in designing and developing its products to purposefully addict and harm users—especially minors and neurodivergent individuals—was extreme and outrageous, and was beyond all possible bounds of decency, and was to be regarded as atrocious and utterly intolerable in a civilized community.

445. Each Defendant knew, like PLAINTIFF, would become addicted to Defendants' respective products because each Defendant designed and developed their respective products to become more stimulative over time, to maximize young consumers' usage time, and to addict them so Defendants can continue to profit off users, including PLAINTIFF, after initial purchase or download.

446. Each Defendant knew that when users, like PLAINTIFF, became addicted to Defendants' respective products due to the addictive and defective qualities thereof, that parents and families, like Plaintiffs, would be forced to deal with an uncontrollable video game addiction in their child and the harmful effects of such addiction.

447. Each Defendant intended to inflict emotional distress (e.g., causing addiction) on users, like PLAINTIFF, and should have known product users and their families, like Plaintiffs, would suffer emotional distress as a result of Defendants' conduct.

448. Plaintiffs have sustained severe emotional distress that has resulted in bodily harm, including but not limited to physical withdrawals, addiction, brain damage, and pain beyond what a reasonable person should be expected to endure because of each Defendant's conduct. More specifically, PLAINTIFF's family has endured PLAINTIFF's bouts of gamer's rage and emotional disturbances which have

required outpatient counseling, medication, tutoring and an individualized education plan.

449. Such conduct in intentionally creating products to addict and abuse children and cause them severe mental and physical harm is extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

450. No reasonable person would be expected to endure such emotional distress suffered by Plaintiffs as a result of each Defendant's conduct.

451. As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, PLAINTIFF has experienced extreme emotional distress that has resulted in bodily harm and will require additional treatment for their mental health conditions proximately caused by Defendants' outrageous behavior.

452. As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, PLAINTIFF and PLAINTIFF's PARENT have experienced extreme emotional distress that has resulted in bodily harm, pain, suffering, and mental anguish, including having to witness PLAINTIFF suffer from addiction, pain, and mental distress caused by Defendants' outrageous conduct.

453. As a direct and proximate result of each Defendant's outrage, Plaintiffs have been damaged. More specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

454. Further, each Defendant's outrageous conduct, as described above, was deliberate, intentional, willful, wanton, reckless, and malicious. Each Defendant displayed flagrant disregard and an entire want of care to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

an award of punitive damages in an amount---imposed by the jury at trial---sufficient to punish the Defendants and deter others from like conduct.

## COUNT VIII

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

### (Alternative Pleading)

455.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

456.   Plaintiffs plead this in the alternative.

457.   At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by PLAINTIFF: Roblox and Fortnite on Xbox.

458.   Each Defendant owed PLAINTIFF a duty to act as a reasonably careful company would under the circumstances.

459.   A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

460.   A reasonably careful company would protect PLAINTIFF from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

461.   A reasonably careful company would not invite, encourage, or facilitate youth, including PLAINTIFF, to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

462.   A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant defectively

designed its respective products to be addictive to young adults and minors, including PLAINTIFF, who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products:

a. Roblox Corp. designed Roblox with psychologically addictive properties and technologies, including but not limited to ever-changing gameplay, microtransactions, social aspects, and the use of algorithms to target players to purchase numerous characters, skins, and other in-game products;

b. Apple designed the Apple App Store in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content;

463. Each Defendant defectively designed its respective products to take advantage of the chemical reward system of users' brains (especially young users including PLAINTIFF to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

a. Roblox Corp. designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

b. Apple designed the Apple App Store in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content;

464. PLAINTIFF was a foreseeable user of the Defendants' respective products.

465. Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of PLAINTIFF's use of Defendants' respective products.

466. Defendants' products, including Roblox, are psychologically and neurologically addictive when used in their intended manner by their intended

audience; and Defendants reasonably should have known that when used as intend by minors, including PLAINTIFF, to use each Defendants' respective product and for users, including PLAINTIFF, to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of Defendants' conduct and immoral tactics.

467.    Each Defendant knew that users, including PLAINTIFF, would become addicted to Defendants' respective products because each Defendant designed and developed their respective products to become more stimulative over time, to maximize young consumers' usage time, and made them addictive to these vulnerable consumers so Defendants can continue to profit off of users, including PLAINTIFF, after initial purchase or download.

468.    At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth, including PLAINTIFF, which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

469.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users, including PLAINTIFF, of its respective products, including PLAINTIFF, would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

470.    Each Defendant has breached the duties owed to PLAINTIFF

471.    Each Defendant has breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion,

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

supervision, and control of its respective products. Those breaches include:

a.   Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including PLAINTIFF;

b.   Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including PLAINTIFF, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.   Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including PLAINTIFF; and

d.   Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users, including PLAINTIFF

472.   Each Defendant has breached its duties of care owed to Plaintiffs through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a.    Failing to implement effective protocols to block users under the age of 13;

b.    Failing to implement effective parental controls;

c.    Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

d.    Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content and/or microtransactions;

e.    Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

f.    Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

473.    A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users, including PLAINTIFF; yet Defendants did not do this. This was a breach of duties owed to Plaintiffs.

474.    Each Defendant's conduct was closely connected to Plaintiffs' emotional distress, which was highly certain to occur.

475.    As a direct and proximate result of each Defendant's breach of one or more of its duties, Plaintiffs have sustained emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct.

476.   As a direct and proximate result of each of the Defendants' negligent conduct and infliction of emotional distress, PLAINTIFF has experienced extreme emotional distress that is medically diagnosable and of sufficient severity to be medically significant, including outpatient counseling, medication and tutoring, and is required (and will require) additional treatment for their mental health conditions proximately caused by Defendants' outrageous behavior.

477.   As a direct and proximate result of each of the Defendants' negligent conduct and infliction of emotional distress, PLAINTIFF and PLAINTIFF's PARENT have experienced extreme emotional distress that is medically diagnosable and of sufficient severity to be medically significant, including addiction, loss of education, depression, a fractured parent-child relationship, and loss of parenting role.

478.   As a direct and proximate result of each Defendant's negligent infliction of emotional distress, Plaintiffs have been damaged. More specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

479.   Each Defendant was negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT IX

### DECEIT/FRAUDULENT MISREPRESENTATION

### (Against All Defendants)

480.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

481.   At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling,

and otherwise distributing the video game products used by PLAINTIFF: Roblox and Fortnite on Xbox.

482.   As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

483.   Each Defendant made representations of material facts about their respective products, while knowing or believing those representations to be false *and* with the intent that Plaintiffs (and the public) rely on those misrepresentations.

484.   These false representations involve misstatements about the safety of each Defendant's product identified herein and include, but are not limited to:

   a. Roblox Corp. misrepresented the Roblox games as safe for use by minors, young adults and neurodivergent individuals, while knowing they had been designed and developed with addictive psychological features to keep users playing Roblox more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that Roblox poses significant risk of harm to users;

   b. Apple misrepresented that its Apple App Store was safe for use by minors and young adults, while knowing that it was designed and developed with addictive features to keep users, like PLAINTIFF, purchasing addictive content, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that its products pose significant risk of harm to users, like PLAINTIFF;

485.   Each Defendant knew their games posed risk to minors, like PLAINTIFF, based on internal research and external studies known in the industry and to each Defendant; yet each Defendant misrepresented the safety and value of their games for the purpose of inducing users, like PLAINTIFF, to purchase/download the game and to continue using Defendants' products to the addiction knowingly caused by Defendants' products.

486.   Each Defendant also knowingly and recklessly misled the public—particularly product users, and their parents, including Plaintiffs, into believing these products were safe or even beneficial for children to use. These misrepresentations of material fact include, but are not limited to:

a. Roblox Corp. marketed Roblox as safe for all ages and as an educational tool without warning of the addictive design and risk of injury associated with its video game product and foreseeable use thereof, despite knowing that Roblox contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by PLAINTIFF;

b. Apple knew that its Apple App Store platform, as well as the Roblox games, contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but intentionally marketed its platform for play by youth and directed its misstatements towards users of Roblox, Minecraft, and other games designed, developed and utilizing the patents and technology described herein;

487.   At all relevant times, within their respective video game products, each Defendant included the ability for users, including Plaintiffs, to purchase in-game downloadable products or microtransactions.

488.   Users of Defendants' products, including minors such as PLAINTIFF, were deceived by each Defendant in connection with these microtransactions through false representations and material misstatements built into each of the Defendants' products.

489.   Defendants' methods of deceit include but are not limited to, using features and patented technology in each Defendant's product, including patented matchmaking technologies and algorithms to "put" players in certain game scenarios requiring additional purchases to advance, AI avatars or "friends" to encourage

purchase, and disguised features of the Defendants' products, which misrepresent to users, like PLAINTIFF, that game-selected purchases would help them advance in the game or complete necessary missions.

490. Defendants made these false representations and material nondisclosures with intent that product users, like PLAINTIFF, spend money on microtransactions.

491. At the time each Defendant utilized these technologies to deceive PLAINTIFF, and each Defendant knew that the representations made through the game were false and existed only to entice PLAINTIFF to continue spending.

492. Each Defendant intended its fraudulent in-game microtransactions and psychological tactics to take advantage of users like PLAINTIFF

493. At the same time, each Defendant knew that misrepresentations served only to increase users'—including PLAINTIFF's—inherent risk of danger, specifically a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

494. PLAINTIFF reasonably relied on Defendants' misrepresentations within each Defendant's product to make several in-game purchases that actually had little to no value to PLAINTIFF within the game.

495. Had Plaintiffs known that the representations in each Defendant's respective products regarding in-game purchases were false and fraudulent, and the result of Defendants' use of patented technologies, PLAINTIFF never would have purchased Defendants' video game products or spent money on additional in-game downloadable content or microtransactions built into the product design.

496. Furthermore, as detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

497.   Even though each Defendant knew of the risks based on its internal information and external studies known to each Defendant, each Defendant intentionally and knowingly misrepresented those findings to avoid losing revenue so that product users, like PLAINTIFF, would continue using each Defendant's respective products.

498.   Each Defendant knowingly and recklessly misled the public, users, and their parents and/or guardians, including Plaintiffs, into believing their video game products were safe or even beneficial for children to use.

499.   Each Defendant intended its misrepresentations, concealment, misstatements, and omissions to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

500.   By intentionally making numerous material misrepresentations, downplaying any potential harm associated with its respective products, and reassuring the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant did fraudulently induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

501.   PLAINTIFF was induced into microtransactions resulting in thousands of dollars spent on in-game purchases or microtransactions.

502.   Each Defendant knew that its concealment, misstatements, and omissions were material, and that users, like PLAINTIFF, would be induced into spending money that they would not spend on Defendants' products if they knew the truth.

503.   A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products. Thus, Plaintiffs justifiably

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

relied on each Defendant's material misrepresentations that the products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content or in-game product transactions in each Defendant's product.

504. As a direct and proximate result of each Defendant's fraudulent inducement, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably relied on Defendant's fraudulent conduct when purchasing, downloading, playing, and/or continuing to use each Defendant's respective products, and/or purchasing downloadable game content or in-game product transactions in each Defendant's product.

505. As a direct and proximate result of each of the Defendant's concealment of material information, Plaintiffs have been financially and otherwise harmed through each of the Defendant's inducements to utilize their products, download and play their games, and/or continuously spend funds through its products.

506. By intentionally making numerous material misrepresentation, including, but not limited to, downplaying any potential harm associated with its respective products, and affirmative representations to the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant intended to mislead the public, users, and their parents, including Plaintiffs, into believing its products were safe for children to use.

507. Each Defendant knew that its misstatements and false representations, as identified herein, were material.

508. The misrepresentations described herein were made to Plaintiffs—particularly to PLAINTIFF—prior to their purchase of each Defendant's product and to PLAINTIFF while PLAINTIFF was using Defendants' products as intended.

509. Each Defendant intended its material misstatements and false representations to induce the public, users, and parents, including Plaintiffs, to

purchase, download, play, continue to use, and/or purchase downloadable game content or in-game product transactions in each Defendant's product.

510. Plaintiffs relied on Defendants' material misstatements and false representations in deciding whether to use, or continue to use, each of Defendants' products; specifically, Roblox.

511. Plaintiffs' reliance on each Defendant's material misrepresentations when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content upgrades or in-game transactions in each Defendant's product was justifiable and reasonable under the circumstances.

512. As a direct and proximate result of each Defendant's material misrepresentations and false statements, *i.e.,* Defendants' deceit, Plaintiffs were not aware and could not have been aware of the material facts that each Defendant misrepresented or falsified, and therefore Plaintiffs justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

513. As a direct and proximate result of each of the Defendant's material misrepresentations and false statements (*e.g.,* Defendants' deceit), Plaintiffs have been damaged. Such damage includes PLAINTIFF's physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; PLAINTIFF's inability to attend school; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to PLAINTIFF's physical and mental injuries. PLAINTIFF's injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

514. Each Defendant engaged in fraudulent misrepresentations and deceit that is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial and in an amount a jury finds will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

515. Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed flagrant disregard for, and an entire want of care and a conscious and depraved indifference to, the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

## COUNT X

## DECEIT/FRAUDULENT OMISSION OR NONDISCLOSURE

### (Against All Defendants)

516. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

517. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by PLAINTIFF: Roblox and Fortnite on Xbox.

518. As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

519. Each Defendant could have disclosed the defective condition of its respective products to the public and advised that the products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

520. Each Defendant intentionally and knowingly did not disclose the serious safety risks presented by its respective products.

521. Each Defendant intentionally omitted or knowingly did not disclose material facts about their respective products, or their collective use of patents designed to addict players to Defendants' products. For instance,

a.  Roblox Corp. did not inform the public that it designed Roblox games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to injury;

b.  Apple did not inform the public that it designed the Apple App Store with addictive features, or that this platform could be used to download addictive games and content, despite knowing that abuse, addiction, and compulsive use by youth can lead to injury;

522.  Each Defendant knew of the risks associated with their respective products based on internal research and external studies known to the industry and each Defendant; yet, intentionally omitted and failed to disclose those findings, to induce youth, including PLAINTIFF, to continue using their respective products.

523.  Each Defendant's silence and nondisclosures of material information about the risks associated with their products was made under facts and circumstances where each Defendant was under a duty to speak about those risks to Plaintiffs and others, because Defendants had superior knowledge or information about their products and the risks of their products that was not reasonably available to Plaintiffs or other consumers, because such information was kept or considered confidential by each Defendant.

524.  Plaintiffs used ordinary diligence in purchasing and using Defendants' products, but Plaintiffs could not, through ordinary diligence, have discovered the true facts known only to Defendants about the deceptive features of their products and the risks of using such products to Plaintiffs.  The undisclosed information detailed above was beyond the reasonable reach of Plaintiffs and was not discoverable in the exercise of ordinary diligence.

525.  Each Defendant knew that its omissions and nondisclosures were material.

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

526. A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products.

527. If Defendants had not omitted material facts regarding the safety of their products, Plaintiffs would not have purchased, downloaded, played, continued to use, and/or purchased downloadable game or content upgrades or in-game transactions in each Defendant's product.

528. As a direct and proximate result of each Defendant's material omissions and intentional nondisclosures, Plaintiffs had no reason to believe that each Defendant's products were unsafe for children to use.

529. As a direct and proximate result of each Defendant's material omissions and nondisclosures, Plaintiffs have been damaged. More specifically, each Defendant engaged in deceitful conduct through its fraudulent omissions and nondisclosure, and that deceitful conduct is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, harm, and damages described herein.

530. Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed a deliberate and flagrant disregard of, and an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

## COUNT XI

## FRAUDULENT CONCEALMENT

### (Against All Defendants)

531.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

532.   At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by PLAINTIFF: Roblox and Fortnite on Xbox.

533.   As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users, particularly minors and young adults.

534.   Each Defendant concealed the serious safety risks presented by its respective products. Defendants' acts of fraudulent concealment include, but are not limited to:

    a.    Roblox Corp and Epic Games designed Roblox and Fortnite, respectively, with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to brain damage and injury, but concealed this information from the public and product users, including Plaintiffs;

    b.    MICROSOFT designed the Xbox with addictive features and as a platform to house addictive gaming products, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the public, product users, and parents, including Plaintiffs and further as a platform through

which game manufacturers, including Defendants, could sell, market, and distribute addictive games to users, who, in turn, could download or access such games on their devices locally in a manner analogous to purchasing games on discs at a traditional store. The Platform Manufacturing Defendants designed its platform to push users to make purchases through the platform while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

535. Each Defendant knew of the risks associated with use of their products based on internal research and external studies known within the industry and to each Defendant, and each Defendant intentionally concealed those findings in order to induce youth, including PLAINTIFF, to continue using its respective products and avoid losing users and revenue,.

536. Each Defendant's silence and nondisclosures of material information about the risks associated with their products was made under facts and circumstances where each Defendant was under a duty to speak about those risks to Plaintiffs and others, because Defendants had superior knowledge or information about their products and the risks of their products that was not reasonably available to Plaintiffs or other consumers, because such information was kept or considered confidential by each Defendant.

537. Plaintiffs used ordinary diligence in purchasing and using Defendants' products, but Plaintiffs could not, through ordinary diligence, have discovered the true facts known only to Defendants about the deceptive features of their products and the risks of using such products to Plaintiffs.

538. Each Defendant knew that its concealment was material.

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

539.    Each Defendant intended its concealment to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game product transactions in each Defendant's product.

540.    A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products.

541.    If Defendants had not concealed material facts about the safety of their respective products, including but not limited to concealing that the products had been designed to be addictive, then Plaintiffs would not have purchased, downloaded played, continued to use, and/or purchased downloadable game content or in-game product transactions in each Defendant's product.

542.    As a direct and proximate result of each Defendant's concealment of material information, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

543.    As a direct and proximate result of each Defendant's concealment of material information, PLAINTIFF has been injured and Plaintiffs have sustained damages, as described herein.

544.    Each Defendant took affirmative steps to conceal the true nature and risk posed by their respective products and each Defendant's fraudulent concealment constitutes intentional, willful, wanton, and reckless conduct displaying  an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers; therefore,  an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct is warranted.

545.    Defendants' fraudulent concealment tolls any applicable statute of limitations.

## COUNT XII

## NEGLIGENT MISREPRESENTATION

### (Against All Defendants)

### (Pleaded in the Alternative)

546.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

547.    Plaintiffs plead this in the alternative.

548.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by PLAINTIFF: Roblox and Fortnite on Xbox.

549.    Each Defendant---and all designers, developers, manufacturers, publishers, and suppliers of video gaming products---had a duty to communicate accurate information and to make truthful statements of material fact to the public. This duty includes but is not limited to telling Plaintiffs the truth about the addictive design and dangerous condition of Defendants' products and that those products posed serious health risks to users, particularly youth.

550.    As detailed herein, each Defendant designed and developed their products to be addictive and knew, or should have known, its respective products pose serious health risks to users, particularly minors, including PLAINTIFF; yet each Defendant made false statements of material fact relating to the educational and developmental value, along with the safety of daily, prolonged use and safety of use by minors due to age-based controls. More specifically, each Defendant made numerous partial material representations to the public, users, and their parents, including Plaintiffs, downplaying any potential harm associated with its products and

reassuring the public, users, and Plaintiffs that its products were safe or even beneficial for children to use:

    a.    Roblox Corp and Epic Games misrepresented Roblox and Fortnite, respectively, as safe for use by minors and young adults, even marketing the games as "educational" and safe for use by all, despite knowing that, due to their own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to injury;

    b.    MICROSOFT misrepresented its Xbox platforms as safe for use by minors and young adults, even marketing the platforms toward youth, despite knowing that, due to their own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to injury;

551. Each Defendant made these false statements and misrepresentations with intent to induce Plaintiffs (and the general public) to purchase and use their respective products believing them to be safe for use as intended, and to continue to use their product and make in-game purchases and microtransactions.

552. Each Defendant knew, or should have known, that their product was addictive and poses safety risks to users based on its internal research and industry-trade secrets known to each Defendant and, therefore, were careless and negligent in ascertaining the truth of their statements prior to making them to Plaintiffs and the public.

553. Defendants' false statements and material misrepresentations downplaying any potential harm associated with its products did, in fact, induce Plaintiffs to purchase and use Defendants' products—and PLAINTIFF and PLAINTIFF's PARENT relied upon Defendants' false statements and misrepresentations in allowing PLAINTIFF to use Defendants' games and gaming products, Likewise, PLAINTIFF relied on Defendants' false statements and

misrepresentations in conjunction with in-game purchases and Defendants' deceptive microtransaction mechanisms, including the use of fake "friends" to induce PLAINTIFF into spending money.

554.   Plaintiffs' reliance on Defendants' false statements was justifiable and reasonable since each Defendant concealed or misstated the truth about the addictive-design of their products.

555.   Plaintiffs have been damaged because of the false statements of each Defendant and Plaintiffs' reliance on each Defendant's statements. This damage includes the injuries and harms to Plaintiffs, described above, including but not limited to PLAINTIFF's addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life. Further, as a direct and proximate result of each of the Defendant's material misrepresentations, PLAINTIFF has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

556.   Plaintiffs would not have incurred these damages, injuries, and economic losses but for the addictive and harmful propensities of Defendants' gaming products.

## COUNT XIII
## IN-CONCERT LIABILITY
### (Against All Defendants)

557.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

558.   In-concert, or shared, liability arises where one party acts in concert with another tortfeasor.

559. As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like PLAINTIFF, with unfair and deceptive trade practices to maximize profits off the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by PLAINTIFF and other users.

560. Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each of the Defendants to utilize the same patents to keep users, including minors like PLAINTIFF, addicted to Defendants' products.

561. More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like PLAINTIFF, with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

562. Each Defendant that licenses harmful patented technology from the creator, designer, and/or developer of said harmful technology is therefore liable for the harmful consequences arising from such technology.

563. Each Defendant knew of the risk of abuse, addiction, and compulsive use by youth, including PLAINTIFF, arising from the harmful technologies and tactics contained in the patents, but continued to enter into licensing agreements, develop additional patents for license, and encourage the other Defendants to do the same.

564. Additionally, Microsoft acted in concert with Roblox and Epic Games to place addictive games and technology in its video game products and encourage the purchase and use of such products by minors, young adults, and neurodivergent individuals.

565. Microsoft did not place any restrictions on game developers collecting and tracking game playing behavior, game stimulus to trigger purchasing

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

microtransactions, or amount of time a player, who is a minor, including PLAINTIFF, can spend playing games.

566. Each Defendant thus assisted in continuing to fraudulently conceal the unreasonable risk of harm in its own gaming product, and in all others.

567. Such concerted conduct allowed Defendants to maximize profits, all while causing significant harm to users, including Plaintiffs.

568. Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of the concerted conduct described herein.

569. Plaintiffs' injuries and damages cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

570. The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' products.

571. As a proximate result of Defendants' conspiring to make their games addicting, PLAINTIFF continues to suffer injuries and is unable to stop using Defendants' respective products as a result of PLAINTIFF's addiction, Defendants' defective design and Defendants' failure to warn consumers, including Plaintiffs, about the addictive qualities and components of those products.

572. Each Defendant actively took part in the tortious, negligent, outrageous, fraudulent, deceptive, and malfeasance that proximately caused PLAINTIFF's addiction and Plaintiffs' damages, as described herein.

573. For these reasons, Defendants have shared liability for Plaintiffs' injuries and damages.

## VII.    PRAYER FOR RELIEF

574. Plaintiff's PARENT, individually and on behalf of PLAINTIFF, and PLAINTIFF as an individual, respectfully request judgment in their favor and against each of the Defendants to the full extent of the law, as follows:

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

a.  For an award of compensatory damages for PLAINTIFF in an amount to be determined at trial on the following elements of damage:

i.  The nature, extent, duration, and permanency of PLAINTIFF's injuries;

ii.  The reasonable expense of all necessary medical care, treatment, and services received including transportation and board and lodging expenses necessarily incurred in securing such care, treatment, and services;

iii.  The present value of all necessary medical care, treatment, and services including transportation and board and lodging expenses necessarily incurred in securing such care reasonably certain to be required in the future;

iv.  The pain, suffering, and mental anguish experienced in the past;

v.  The pain, suffering, and mental anguish reasonably certain to be experienced in the future;

vi.  The present value of any loss of ability to earn in the future;

vii.  Any scars, disfigurement, and visible results of PLAINTIFF's injuries;

viii.  The reasonable expense of any necessary help in PLAINTIFF's home which has been required as a result of PLAINTIFF's injuries;

ix.  The present value of any necessary help in PLAINTIFF's home reasonably certain to be required in the future;

x.  PLAINTIFF's inability to attend school;

xi.  Actual financial loss; and

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

xii.    Any other actual pecuniary loss or future financial loss proximately caused by Defendants.

b.    For an award of compensatory damages for PLAINTIFF and PLAINTIFF's PARENT, in an amount to be determined at trial, to fairly compensate PLAINTIFF and PLAINTIFF's PARENT for pain, suffering, mental anguish, emotional distress, actual financial loss, and the reasonable value of any loss of the services of PLAINTIFF resulting from the injuries to PLAINTIFF proximately caused by Defendants' tortious acts and misconduct described herein;

c.    For an award of actual damages, including economic and pecuniary loss, in an amount to be determined at trial;

d.    For an award of statutory damages in an amount to be determined at trial;

e.    For an award or punitive damages in an amount to be determined at trial;

f.    For an award of costs and attorneys' fees, as allowable by law;

g.    For pre-judgment and post-judgment interest, as allowable by law; and

h.    For such other and further relief as this Court may deem just and proper.

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial

## VIII.    <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.


DATED:  November 12, 2025          <u>  /s/ T. Matthew Leckman          </u>
T. Matthew Leckman (PA ID 92241)
**LECKMAN LAW LLC**
418 Newbold Road
Jenkintown, PA 19046
Tel: (215) 635-0584
<u>matt@leckmanlaw.com</u>

Ruth Rizkalla, Esq. (*pro hac vice* to be filed)
**THE CARLSON LAW FIRM**
1230 Rosecrans Ave, Suite 300
Manhattan Beach, CA| 90266
254-526-5688
<u>rrizkalla@calrlsonattorneys.com</u>
*Attorneys for Plaintiff, Jayda White and*
*Plaintiff's Parent, Tonia Lee*

Complaint for Damages Action Seeking Nationwide Relief and Demand For Jury Trial